**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Peter GUEVARA, Defendant-Appellant.**

**No. 78–1273.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1978.

Decided May 14, 1979.

William T. Dwyer, Jr., Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., John F. Podliska, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SPRECHER, TONE and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellant Peter Guevara appeals from his conviction for possession and distribution of heroin in violation of the federal narcotics laws. First, Guevara contends the evidence adduced at trial was insufficient to prove beyond a reasonable doubt that he was not entrapped by agents of the federal government to engage in the narcotics transaction which resulted in his arrest and subsequent conviction. Second, he contends the district court erred as a matter of law in allowing certain hearsay statements to be introduced into evidence over his objection. We are not persuaded by the arguments advanced in support of these contentions and accordingly, affirm the judgment appealed from for the reasons set forth below.

I.

The defendant was arrested along with four other individuals on February 16, 1977, in connection with a negotiated sale of narcotics to agents of the Drug Enforcement Administration (hereinafter DEA). Subse-

quent to his arrest, a federal grand jury returned a two count indictment against the defendant, charging him with the possession and distribution of approximately 1800 grams of heroin in violation of Title 21, United States Code, Section 841(a)(1). The defendant entered pleas of not guilty to both counts, interposed a defense of entrapment, and proceeded to a jury trial upon the charges. The jury returned a verdict finding the defendant guilty as to both counts of the indictment, and the court imposed a sentence of imprisonment for a term of three years, to be followed by a three year special parole term. The defendant subsequently appealed to this court.

Before addressing the defendant's first argument on appeal concerning the issue of entrapment, it is necessary to explicate in appropriate detail the circumstances leading up to the defendant's arrest. The evidence adduced at trial on the issue of entrapment, viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), showed that during the early months of 1977, an individual known as Ronald Segal owned International Control, Ltd., a business located in Chicago, Illinois, and engaged in the sale of security alarms and other similar protective devices. During this period, Segal was also employed by the DEA as a confidential informant. Early in January, 1977, Segal hired James Antee, a nephew of the defendant, to work for him as a commission salesman. At the conclusion of a one week sales training program conducted by the company, Segal approached Antee and inquired whether Antee could locate a source of supply for cocaine. Segal also showed Antee a "flash roll" representing a considerable sum of money and a valise containing a substantial quantity of pills.

On January 14, 1977, at approximately 11:30 p. m., Antee telephoned Segal from the defendant's residence, ostensibly for the purpose of obtaining a price quotation for an order of eighteen security alarms which the defendant indicated an interest in purchasing after seeing Antee's sales presentation. Upon receiving a price quotation for the prospective order, Antee then inquired whether Segal remained interested in purchasing a substantial quantity of narcotics. When Segal expressed interest, the defendant entered the telephone conversation and arranged to meet that evening at Segal's office to negotiate the purchase of cocaine the defendant claimed to have available for sale.

Segal then telephoned DEA Agent Albert Nedoff at his home in Indiana to relate the details of his telephone conversation with the defendant. Agent Nedoff explained to Segal that he would be unable to arrive at Segal's office in time for the meeting with the defendant, and instructed Segal to negotiate with the defendant, but to refuse to purchase any narcotics ·from him at the meeting. Nedoff further instructed Segal to attempt to arrange a future transaction, and to report back to him concerning the details of the meeting.

Two hours later, the defendant arrived at Segal's company premises with three other persons: James Antee, Jose Espinoza, and an individual referred to as "John". The defendant asked Segal about the quantity of cocaine desired, indicating he had approximately 100 grams available for sale. According to Segal, Espinoza gave the cocaine to the defendant, who then handed it to Segal. Segal conducted a field test on the substance, but, acting under the instructions of Agent Nedoff, declined to purchase the cocaine, claiming it lacked suitable quality. Segal then stated he was interested in purchasing larger quantities of better quality heroin or cocaine, and mentioned his acquaintance with an individual named "Alphonse", who represented a drug purchasing syndicate based in Denver, Colorado. Segal offered Espinoza some money to compensate him for his efforts, but it was refused. The defendant apologized to Segal for the inconvenience of the late hour, and promised he would contact a source to arrange the purchases Segal desired. As the meeting concluded, Segal offered the defendant $5,000 to obtain a source of narcotics.

The next morning, Segal telephoned Agent Nedoff to report the details of his meeting with the defendant and his associates. However, Segal did not inform Agent Nedoff until the date of the arrest that the defendant had been offered $5,000 to locate a source for narcotics.

A series of telephone conversations between Segal and the defendant occurred during the next several days. On January 21, 1977, at approximately four or five o'clock in the afternoon, Segal telephoned the defendant from his company office. Using a speaker telephone system, Segal introduced the defendant to DEA Agent Albert Nedoff, who was posing as "Alphonse", the individual to whom Segal had referred at his first meeting with the defendant. Also present during the telephone conversation was DEA Agent John Bott, although this fact was not disclosed to the defendant. Agent Nedoff asked the defendant whether they could do "business", and the defendant responded affirmatively. Nedoff indicated he was only interested in purchasing kilos of heroin and the defendant replied that an arrangement for such quantities would be possible, although it would first be necessary to build trust between the parties based upon smaller quantities. Nedoff concluded the conversation by telling the defendant to contact Segal when he was ready to do business.

On February 11, 1977, the defendant and Nelson Ortiz made an unsolicited visit to Segal at his company offices for the purpose of investigating Segal and his business before engaging in any drug transactions. The parties discussed qualities, quantities, and prices for subsequent transactions. During the next few days, several telephone calls between Segal and the defendant were exchanged concerning the details of the proposed heroin transactions.

Segal telephoned the defendant at his place of employment on February 16, 1977. Using the telephone speaker system, with Agents Bott and Nedoff present, Segal asked the defendant whether the heroin would be delivered. The defendant replied that the heroin would be delivered that day.

When asked about the quantity involved, the defendant responded that the first delivery would consist of one kilo, and if the delivery went smoothly, four additional kilos could be expected.

At approximately 4:00 p. m. that afternoon, the defendant telephoned Segal and informed him that the delivery was in progress and that it could be expected to arrive around 5:20 p. m. At approximately 6:15 p. m., Segal again called the defendant to inquire about the delivery. The defendant urged Segal and Nedoff to continue to wait while he attempted to determine the cause of the delay. Finally, around 7:20 p. m., Ortiz arrived outside Segal's business offices with several other persons. These persons waited in their automobiles, while Ortiz entered the premises of Segal's company. In Segal's office, Ortiz met with Segal and Agent Nedoff, who was introduced to Ortiz as "Alphonse". Agent Bott had moved to an adjoining room to conceal his presence.

Ortiz produced a package from a brown paper bag. The contents were tested for opiate presence, and the results were positive. Ortiz demanded $29,000 for the kilo of heroin. Agent Nedoff asked Ortiz to produce the other four kilos that had been discussed, and suggested that payment could then be made for all five kilos in one transaction. Ortiz refused, however, insisting upon immediate payment for the first kilo, and suggested that the other four could be delivered within an hour. At that point, Agent Nedoff placed Ortiz under arrest, and Agent Bott, along with other officers, effected the arrests of the persons outside the building who had arrived with Ortiz.

At approximately 8:00 p. m., the defendant telephoned Segal to inquire about the delivery. Segal told him that Ortiz had arrived and that Guevara should come down to Segal's office to receive "what was coming to him". During the telephone conversation, Ortiz unsuccessfully attempted to warn Guevara that DEA agents were present. The defendant arrived at Segal's company around 9:00 p. m. to obtain his

share of the proceeds, and was placed under arrest by Agent Bott.

## II.

Guevara challenges his subsequent conviction for possession and distribution of heroin on two grounds. First, the defendant contends the evidence failed to show beyond a reasonable doubt that he was not entrapped by DEA agents to engage in the narcotics transaction. The defendant argues that, although he affirmatively established the element of inducement on behalf of his defense of entrapment, the government failed to meet its burden on the element of predisposition, since its evidence was based solely upon the allegedly incredible, unsubstantiated, and uncorroborated testimony of Ronald Segal, a confidential informant for the DEA.

In support of his claim that he was not predisposed to commit the offenses, the defendant testified at trial that he had no prior experience dealing in narcotics, had never been arrested, had been employed by the same company for over six years, was supporting a wife and family, was a decorated war veteran, and had only entered into the drug transaction after Segal repeatedly solicited him to locate a drug source and offered him the sum of $5,000 to do so. Based upon this testimony, the corroborating testimony of James Antee, and the allegedly incredible and uncorroborated testimony of the government informant, the defendant asserts he established entrapment as a matter of law.

We disagree. An examination of the record in this case, assessed in the light most favorable to the government, compels the conclusion that the evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant was not entrapped by federal agents to commit the offenses for which he was charged.

The defendant's testimony that he was not predisposed to engage in the narcotics transaction was not uncontradicted. The testimony of DEA Agents Nedoff and Bott, and the informant Ronald Segal, as well as the testimony of the defendant and his own witness, James Antee, was sufficient to prove predisposition beyond a reasonable doubt.

Agent Nedoff's testimony, relating his conversations with the defendant during January and February, 1977, demonstrated the defendant's knowledge and understanding of dealing in narcotics. For example, when Agent Nedoff, posing as "Alphonse", indicated to the defendant that he would only transact business if the defendant could supply kilos of heroin, the defendant responded to the invitation to withdraw by stating that kilos were obtainable, but first it would be necessary to build trust between the parties with transactions consisting of smaller quantities.

Moreover, during telephone conversations with Agent Nedoff on the day of the arrest, the defendant exhibited a detailed knowledge of the logistics of the transaction, the quality of the heroin, an understanding of the techniques of trafficking in narcotics, and a strong disposition to sell heroin. For example, during his conversations with Nedoff that day, the defendant characterized the heroin as "uncut", provided a description of the individuals who would be making the delivery and the vehicles to be used, and described the location from which the heroin was being transported. Guevara also indicated that one kilo of heroin would be delivered initially, and if that transaction went smoothly, then he and his associates were prepared to promptly negotiate the sale of four additional kilos of heroin. In a later telephone conversation that evening, when Agent Nedoff expressed impatience with the delay in the delivery, the defendant sought to persuade Nedoff to continue to wait for the delivery while the defendant attempted to determine the cause of the delay. Agent Nedoff's testimony concerning these conversations was substantiated by the testimony of Agent John Bott and Ronald Segal, who were present with Agent Nedoff and heard these conversations through the telephone speaker system installed in Segal's office.

Furthermore, James Antee, the defendant's own witness, testified that Guevara was present when Antee telephoned Segal. When Antee inquired of Segal whether he

was still interested in purchasing cocaine, Guevara entered the telephone conversation and told Segal that he knew someone who might be interested in selling cocaine, and arranged for a meeting with Segal for later that evening.

Finally, Ronald Segal, in his testimony relating to the initial meeting with the defendant, stated that he negotiated with the defendant and his three associates to purchase the approximately four ounces of cocaine tendered to him by the defendant during their meeting, and that, upon refusal to purchase the cocaine, Segal offered Guevara $5,000 to obtain a source of supply for substantial quantities of cocaine or heroin. Segal also testified to numerous telephone conversations between himself and the defendant, which both parties had initiated, subsequent to their initial meeting.

Guevara admitted in his testimony that he attended the meeting at Segal's office, but denied any participation in the cocaine transaction. He contended he became involved in the heroin transaction only after repeated solicitations by Segal, and that the inculpatory statements made to Agent Nedoff and to Segal were merely lies calculated to lead them on for the purpose of obtaining the $5,000 offered to him by Segal.

Thus, the jury was presented with specific evidence to refute the defendant's claim that he was not predisposed to engage in the narcotics transaction which resulted in his arrest. Even if the defendant's testimony was not contradicted, the jury was entitled to disbelieve that testimony and find against the defendant on the issue of entrapment. *See, e. g., Masciale v. United States*, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958); *United States v. Garcia*, 562 F.2d 411 (7th Cir. 1977). Nevertheless, we are convinced there was sufficient evidence in the record for the jury to conclude beyond a reasonable doubt that the defendant was not entrapped by agents of the federal government.

### III.

Appellant also contends that the trial court erred as a matter of law in allowing certain hearsay statements to be introduced into evidence over his objections, and that the improper admission of this evidence mandates the reversal of his conviction. Although we agree that the testimony was inadmissible under the Federal Rules of Evidence, we find the admission constituted harmless error beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The contested evidence consisted of certain hearsay statements related by Agent Nedoff during his rebuttal testimony. Earlier in the trial, under direct examination by the government, Ronald Segal had testified to the details of his initial telephone conversation and subsequent meeting with the defendant, as well as to the details of his telephone conversations with Agent Nedoff both before and after the meeting. Segal was extensively cross-examined on this testimony by the defense attorneys, and his credibility was vigorously attacked with references to his practice of displaying a "flash roll" representing $30,000 to $40,-000 in cash, to a prior charge in Florida in 1974 involving cocaine, and to the amount of money he received from the Drug Enforcement Administration in payment for his services as an informant. The objective of this cross-examination was to establish a charge of improper motive underlying Segal's testimony as to the defendant's predisposition to engage in the narcotics transaction.

In rebuttal, the government called Agent Nedoff, whose testimony substantially corroborated Segal's prior testimony concerning the initial conversation and subsequent meeting with the defendant, based on Nedoff's telephone conversations with Segal prior to and following that meeting. The defendant's timely objection to this rebuttal testimony was overruled by the district court, and this ruling is challenged on appeal.

The government contends the rebuttal testimony of Agent Nedoff was admissible under Fed.R.Evid. 801(d)(1)(B), as evidence of a prior consistent statement of a witness, or in the alternative, admissible under Fed.R.Evid. 803(24), as reliable and necessary hearsay.

Rule 803(24) requires, *inter alia,* that the district court make certain findings with respect to the evidence sought to be admitted, and that the proponent provide timely notice of its reliance on the rule to the adverse party. In this case, the challenged testimony cannot be properly characterized as admissible under Rule 803(24), since it was neither advanced by the trial court nor asserted by the parties as grounds for admissibility at trial. Consequently, neither the notice nor the findings provisions of the statute were complied with at trial. Nor, obviously, can these defects be cured by retroactive application on appeal. Accordingly, the government's reliance on Rule 803(24) is misplaced.

The government's alternative reliance on Fed.R.Evid. 801(d)(1)(B) also suffers from a failure to comply with the statute. Rule 801(d)(1)(B) provides, in pertinent part:

"(d) *Statements which are not hearsay.* A statement is not hearsay if—

(1) *Prior statement by [the] witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is  .   .   .

(B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive  .   .   .."

The government asserts that the requirements of Rule 801(d)(1)(B) were met because (1) the declarant, Ronald Segal, testified at trial; (2) the declarant was subject to cross-examination concerning the declaration; (3) the testimony of Agent Nedoff was consistent with the declarant's testimony; and (4) the testimony was offered to rebut a charge of improper motive against the declarant.

However, the government failed to satisfy the fourth standard for admissibility under Rule 801(d)(1)(B) because Agent Nedoff's rebuttal testimony did not rebut the allegation of improper motive raised by the defendant. During the cross-examination of Ronald Segal, the defense charged that he had induced the defendant to engage in the narcotics transaction with the promise of a $5,000 reward, and implied that Segal's testimony as to the defendant's predisposition prior to the inducement was a fabrication motivated by Segal's expectation to profit from the transaction as a paid informant for the government. The government argues that Agent Nedoff's testimony rebutted this implied charge of improper motive for several reasons. First, it corroborated Segal's testimony concerning the details of his telephone conversations with Agent Nedoff, as well as the details of his initial telephone conversation and subsequent meeting with the defendant. Second, it showed that Segal, as a confidential informant, was merely following DEA Agent Nedoff's instructions during the meeting. Finally, the government contends the rebuttal testimony substantiated Segal's previous testimony that the defendant was predisposed to engage in narcotics trafficking prior to being offered $5,000 by Segal.

The fallacy of the government's position is that testimony corroborating a declarant's prior testimony does not necessarily rebut an implied charge of improper motive, where the prior testimony is alleged to be based upon the improper motive. Thus, the fact that Segal's testimony was substantiated by Nedoff's rebuttal testimony does not remove the implication of improper motive from Segal's prior testimony. Accordingly, the rebuttal testimony was not admissible under Rule 801(d)(1)(B).

Nevertheless, we conclude the improper admission of Agent Nedoff's rebuttal testimony constituted harmless error beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Although it failed to rebut the implied charge of improper motive, the testimony did not prejudice the defendant since it merely established that Ronald Segal's previous testimony as to the initial telephone conversation and meeting with the defendant was consistent with Segal's statements to Agent Nedoff in their telephone conversations before and after the meeting.

Thus, we are not persuaded that the admission of this testimony had any substantial influence on the judgment of the jury,

or that there was any reasonable possibility that it contributed to the defendant's conviction.

Accordingly, for the foregoing reasons, the judgment of the conviction is affirmed.

Affirmed.

TONE, Circuit Judge, dissenting.

I differ with the majority only on the harmless error question. As Judge Bauer demonstrates, Rule 803(24) is unavailable to the government, and the hearsay was inadmissible under Rule 801(d)(1)(B), because the motive to falsify was the same when the hearsay statement was made as it was when the declarant testified at trial. *See 4 Weinstein's Evidence* ¶ 801(d)(1)(B)[01] at 801–100 (1977); 4 Wigmore, *Evidence* § 1128 at 268–270 (Chadbourn Rev.1972). In view of the critical importance of the credibility of the informer, I would reverse and remand for a new trial.