UNITED STATES of America, Plaintiff-Appellee,

v.

Juan NAVARRO, Andres Mugercia and Guillermo Perdomo, Defendants-Appellants.

Nos. 83–1602, 83–1639 and 83–1640.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 7, 1984.

Decided June 14, 1984.

Cudahy, Circuit Judge, filed dissenting opinion.

---

David Bortman, Jerry B. Kurz, Gerald J. Collins, Chicago, Ill., for defendants-appellants.

L. Felipe Sanchez, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and FLAUM, Circuit Judges, and BARTELS, Senior District Judge.*

BARTELS, Senior District Judge.

Guillermo Perdomo, Juan Navarro, and Andres Mugercia appeal from a jury verdict finding them guilty of conspiracy and distribution of cocaine.[1] Perdomo and Navarro received suspended sentences and five years probation, and Mugercia received a sentence of three years imprisonment plus a special parole term and probation. Their appeal is predicated upon the failure of the district court to (1) permit inquiry into an informant-witness' home address and place of employment, (2) order production of the informant's Immigration and Naturalization Service ("INS") file, and (3) find entrapment as a matter of law.

I

*Background*

Defendants' convictions arose from the sale of cocaine in September, 1982 to an undercover Drug Enforcement Administration ("DEA") agent, Leo Arreguin. A DEA informant, Jose Gutierrez, had introduced defendants to Arreguin. Defendants do not dispute the sale, but contend that they had been entrapped by Gutierrez and Arreguin. The government presented its case largely through the testimony of Gutierrez and Arreguin. Perdomo and Navarro took the stand on their own behalf but Mugercia did not.

*Gutierrez's and Arreguin's Testimony*

Gutierrez first met Perdomo in December, 1981, when Perdomo was employed at Grant Hospital in Chicago, to which Gutierrez had been assigned by a private security agency as an undercover agent to investigate drug dealings and thefts involving hospital employees. Gutierrez's work at Grant Hospital was in a dual capacity because he had also been an active DEA informant since September, 1980. When Gutierrez first befriended Perdomo he inquired whether Perdomo knew of anyone at the hospital willing to sell Gutierrez cocaine. Perdomo, unaware of Gutierrez's undercover role, said that he did and shortly thereafter introduced Gutierrez to "Elias," a hospital employee. Perdomo vouched for Gutierrez and was present when Gutierrez and Elias discussed a cocaine purchase. Without further participation by Perdomo, Gutierrez at a later date purchased cocaine from Elias' brother, leading to the arrests of both brothers.[2] After his initial inquiry concerning cocaine dealers, Gutierrez ceased further inquiry of Perdomo, even though the two became

* The Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

1. All three appellants were convicted on Count One of the four-count indictment, which charged narcotics conspiracy in violation of 21 U.S.C. § 846. All three were also convicted on Count Three, which charged distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). Navarro was convicted on Count Two, which charged him alone with an additional violation of § 841(a)(1). Prior to trial, co-defendant Vincente Chao, who is not involved in this appeal, pleaded guilty to Counts One and Four; the latter charged Chao alone with a separate violation of § 841(a)(1).

2. In April, 1982 Perdomo asked Gutierrez if he was responsible for the arrests and Gutierrez falsely responded that he knew nothing of them.

friends and met frequently on a social basis afterwards.

In August, 1982, Perdomo asked Gutierrez about finding someone interested in buying cocaine. Gutierrez warned Perdomo not to get involved with drugs, but agreed to "help" after Perdomo persisted and claimed he needed the money. Gutierrez arranged a meeting with "Polo" as a possible buyer. In fact, "Polo," whom Gutierrez had previously identified to Perdomo as a wealthy and influential friend, was Agent Arreguin, Gutierrez's DEA contact. Gutierrez and Arreguin met Perdomo near Grant Hospital in mid-August to discuss a sale of cocaine. Perdomo, however, could not answer Arreguin's questions about price and quality, stating that he had a friend who could. On September 3rd Arreguin and Gutierrez met with Perdomo who introduced Navarro as the friend previously mentioned. Navarro offered to arrange the delivery of cocaine to Arreguin in Miami, Florida, and promised to check with his source regarding a sample.

Perdomo and Navarro—the latter playing a more substantial role—contacted Gutierrez and Arreguin numerous times during the following week in connection with a proposed sale in Miami of two kilograms of cocaine. At a meeting on September 7th Navarro purportedly called his Miami source to whom Gutierrez spoke briefly and whose voice Gutierrez later identified as that of Mugercia.[3] After the call Navarro assured Arreguin of the cocaine's high quality based on Navarro's familiarity with the source and his prior experiences transporting cocaine by vehicle from Florida to Illinois. Arreguin, however, declined to make the purchase in Florida and requested Navarro to check with his local sources. Approximately one week later Navarro told Gutierrez that he had located a Chicago source of cocaine and had a sample. Shortly thereafter Navarro met Arreguin near Gutierrez's home and sold him a sample for $150.[4] After discussion of the terms Arreguin told Navarro to contact his source and call when ready to deliver.

The sale took place on September 21st. Perdomo and Navarro were to receive a $3,000 commission for arranging the sale to Arreguin of one pound of cocaine for $35,000. Perdomo and Navarro introduced Mugercia to Arreguin and Gutierrez as the one who would deliver the cocaine within minutes after counting the money. Surveillance agents watched as Mugercia departed to a nearby alley where he picked up a half-pound package of cocaine from Vincente Chao and delivered it to Arreguin as the first phase of the sale, whereupon all the defendants were arrested.

*Perdomo's and Navarro's Testimony*

Perdomo and Navarro sharply disputed the testimony of Gutierrez and Arreguin. Perdomo claimed that in December, 1981, when Gutierrez first inquired about cocaine dealers, he responded negatively and that Elias was just one of many people at the hospital Perdomo introduced to Gutierrez as a friendly gesture. Perdomo specifically denied any knowledge of Elias' connection with drugs. In addition, Perdomo testified that Gutierrez periodically asked him about cocaine dealers as part of a deliberate campaign to induce him to find cocaine for Arreguin. Perdomo claimed to have met Arreguin in February, 1982, and that Arreguin also urged him to find cocaine sources in exchange for money. Perdomo denied initiating in August the sale which took place in September, and generally claimed no involvement with drugs prior to meeting Gutierrez.

Navarro, a friend of Perdomo's from their native Cuba, testified that he coincidentally met Gutierrez in August, 1982 at Perdomo's apartment and, being unemployed at the time, fell prey to Gutierrez's offer of money in exchange for finding cocaine sources for Arreguin. According to Navarro, all his statements regarding a

---

**3.** Navarro testified that he had called a friend named "Angel" and not appellant Andres Mugercia, contrary to Gutierrez's identification of Mugercia's voice.

**4.** This sale was the basis for the charge against Navarro alone in Count Two.

Miami source of cocaine were "puffery" designed to stall for time while he located a local source. Similarly, Navarro claimed that the call to his Miami source on September 7th was actually a pre-arranged local call to a friend as part of the ruse. Navarro joined Perdomo in claiming no prior involvement with narcotics prior to meeting Gutierrez. In sum, Navarro and Perdomo depicted themselves as non-predisposed victims of Gutierrez's persistent efforts, as a paid informant, to induce them to find cocaine for sale to Arreguin.

*Impeachment of Gutierrez*

Defense counsel vigorously attacked the credibility of Gutierrez, whose testimony obviously was crucial in rebutting defendants' entrapment defense. Gutierrez's past included deportation from the United States in 1966 as an illegal alien and, after re-entering in 1968 as a legal resident, a 1976 conviction and jail term for participating in a large-scale heroin importation and distribution conspiracy. After his release from prison Gutierrez offered his services to the DEA as an informant, and from September, 1980 to the time of trial he earned $18,000 in that capacity, working on 20–25 cases. Finally, in 1981 the INS sought to deport Gutierrez because of his 1976 conviction. However, after a hearing at which Arreguin testified on Gutierrez's behalf, the immigration judge waived deportability over the INS's objections. In connection with their efforts to impeach Gutierrez's credibility, defendants challenge the district court's rulings concerning the failure to produce his INS file and suppression of his home address and place of employment on cross-examination.

### A. *The INS File*

Based on the DEA's intervention in Gutierrez's 1981 deportation proceeding, defense counsel contended before the jury that Gutierrez's residency in the country was conditioned upon cooperation with the DEA. Such an agreement, counsel argued, would motivate Gutierrez to lure innocent persons into finding sources of narcotics and then testify falsely in order to earn money and insure his continued residency.

Prior to trial, counsel subpoenaed Gutierrez's INS file to search for evidence of such an agreement. The government did not comply and on the first day of trial, prior to Gutierrez's direct testimony, counsel moved to compel production of the file. The government resisted disclosure on the ground that the file would reveal Gutierrez's home address and place of employment. An INS attorney who was present in court and who had located the file explained to the court the circumstances of the 1981 deportation proceeding. In response to the court's specific question, the attorney represented that no agreement existed between the government and Gutierrez conditioning his residency upon cooperation with the DEA or any other governmental agency. The court, accepting the government's representation in lieu of reading the voluminous file offered for *in camera* inspection, denied the defense request.[5] In so ruling, the district court made no mention of the government's alleged justification for nonproduction, *i.e.*, revelation of Gutierrez's address and place of employment.

5. After Navarro's counsel asked the INS attorney a few questions concerning DEA intervention in the deportation proceedings, the following colloquy transpired:

> The Court: Look, I am not going to conduct a trial within a trial here. This case has been set for trial for a long time, and I have heard enough to satisfy me that there is no need for me to read that file. It looks like it is about three inches thick, and I am not going to read it. I am going to accept the representation of Government counsel.
>
> Mugercia's Counsel: Judge, we have not asked you to read the file. We subpoenaed it

and, as I understand it, the only reason that they are resisting is because it contains the man's addresses.

> As I understand the case law, his address is disclosable unless there is some actual threat to him from disclosing the address. There is no presumption that every informant is endangered. As far as that goes, I am willing to give the court my representation ... that if I know his address, I am not going to disclose it to my client, if you think that is a necessary safeguard.
>
> The Court: Be that as it may, the file will not be produced.

## B. *Gutierrez's Home Address and Place of Employment*

Having detected the government's reluctance to disclose Gutierrez's address and work place in connection with the INS file, defense counsel requested an advance ruling whether the court would permit cross-examination of Gutierrez as to this information. Counsel argued that they were presumptively entitled to this information "as being the foundation of cross-examination." [6] The district court ruled against the proposed cross-examination questions, relying on the fact that disclosure would threaten Gutierrez's usefulness to the government as an informant in on-going, unrelated narcotics investigations. The court added, however, that it would permit counsel to inquire what city Gutierrez resided in, the kind of work he did, and the general location of his place of employment within the city (*e.g.* north side). The court also ordered the government to submit *in camera* Gutierrez's address and some substantiation of his claimed employment. After viewing Gutierrez's employee badge and address, the judge stated, "I see nothing about the address of Mr. Gutierrez that would have any significance one way or the other in this case." Mugercia's counsel argued that the purpose of eliciting the information would be to inquire of neighbors and co-workers concerning Gutierrez's character. Navarro's counsel thereupon requested immediate disclosure and a three-day continuance for that purpose. The judge adhered to his ruling, expressing his skepticism of counsel's proposed mid-trial investigation and commenting that Navarro's request for an adjournment was untimely.

Subsequent testimony of Perdomo and Navarro revealed that they already knew, to varying degrees, the information at issue. On direct examination, Perdomo testified that he twice visited the security agency for which Gutierrez worked in April, 1982, and gave the agency's address. He further testified that he knew two residences maintained by Gutierrez and had visited each many times. Also on direct examination, Navarro testified that he knew one of the two residences. The record does not reveal whether any of this known information was, before trial, circulated among defendants or counsel.

## II

### *Nonproduction of the INS File*

Defendants argue that nonproduction of Gutierrez's INS file violated their Sixth Amendment confrontation rights by effectively restricting their opportunity to cross-examine Gutierrez as to his motives and biases. Defendants present an additional and distinct claim that nonproduction violated their due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. It is necessary to address these arguments separately.

■■■ There is no question that the Confrontation Clause of the Sixth Amendment guarantees an accused an opportunity to effectively cross-examine a government witness and test the reliability of the witness before the jury. *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *see Ohio v. Roberts*, 448 U.S. 56, 63–65 & n. 6, 100 S.Ct. 2531, 2537–2538 & n. 6, 65 L.Ed.2d 597 (1980). Defendants' reliance on the Sixth Amendment in the present context, however, is totally misplaced. The district court in no way restricted cross-examination of Gutierrez as to his possible motives and biases and defendants do not, in actuality, claim otherwise. Their complaint relates solely to nonproduction of the INS file which, they assert, *may* contain evidence of an undisclosed cooperation agreement. The right of cross-examination guaranteed by the Sixth Amendment, however, does not include a right of access to the prosecutor's files in order to search for impeachment

---

**6.** In opposition the government, while conceding that there had been no threats by the defendants, implied a general threat to Gutierrez and his family because of "the very nature of the narcotics trade."

material. *United States ex rel. Meadows v. New York,* 426 F.2d 1176, 1184 (2d Cir. 1970), *cert. denied,* 401 U.S. 941, 91 S.Ct. 944, 27 L.Ed.2d 222 (1971); *Martin v. Blackburn,* 521 F.Supp. 685, 699 (E.D.La. 1981), *aff'd sub nom. Martin v. Maggio,* 711 F.2d 1273 (5th Cir.1983); *cf. United States v. Bastanipour,* 697 F.2d 170, 174 (7th Cir.1982), *cert. denied,* 460 U.S. 1091, 103 S.Ct. 1790, 76 L.Ed.2d 358 (1983) (no Sixth Amendment violation where defendant claimed that destroyed handwritten draft of post-arrest report made by DEA agent-witness might have included matters omitted from preserved typewritten report). Accordingly, any obligation to disclose the INS file has its source, if at all, in due process under *Brady* and not the Sixth Amendment and it would have been more appropriate had defendants limited their claim to the *Brady* doctrine.

In *Brady* the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court held that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady* rule]." *Id.* at 154, 92 S.Ct. at 766 (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)).

The major obstacle in the path of defendants' *Brady* claim is the speculative nature of their contention that Gutierrez's INS file contains evidence of a cooperation agreement. The *Brady* analysis assumes the discovery, after trial, of favorable, material information known to the prosecution but unknown to the defense. *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972); *United States v. McPartlin,* 595 F.2d 1321, 1346 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Keogh,* 391 F.2d 138, 147–48 (2d Cir.1968). Yet here the defendants have given no indication of the existence of such material information or that the government knows of such information which would likely have changed the verdict or created a reasonable doubt that did not otherwise exist. The existence of the INS file, without disclosure of its contents, is immaterial to Gutierrez's credibility and does not constitute, on its face, *Brady* impeachment material. Defendants necessarily are constrained to argue that the INS file *might* contain *Brady* material. Since the file was not made part of the record, this court is unable to characterize its contents.

■ The problem might have been solved had the district court examined the INS file *in camera* at some point prior to cross-examination of Gutierrez, *e.g., United States v. Zarattini,* 552 F.2d 753, 757 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977); *United States v. Loman,* 551 F.2d 164, 166 (7th Cir.), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977); *see also United States v. Mackey,* 571 F.2d 376, 388–89 (7th Cir.1978) (post-trial inspection), in which case the file would have been available upon appellate review. In the instant case the court made no such *in camera* inspection and thus the issue is presented whether due process requires a remand for *in camera* inspection and a new trial granted if favorable, material information is thereby discovered. We think not. Mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court. We reached the same conclusion in *United States v. Robinson,* 585 F.2d 274, 281 (7th Cir.1978) *(en banc), cert. denied,* 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979), although there the problem was

compounded by the extremely large number of government files involved.[7] Similarly, in *United States v. Balliviero*, 708 F.2d 934, 943 (5th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983), the court found no error in denying defendant access to the transcript of a government witness' sentence reduction hearing where the defendant had merely alleged that the transcript may reveal additional promises made by the government to the witness. And in *United States v. McPartlin*, 595 F.2d at 1346 n. 32, this court held that there had been no due process violation where the defendants' claim that the government withheld some exculpatory material was based on conjecture and the defendants offered nothing to rebut the government's assertion that it had turned over all requested material.

Similar to the above cases, defendants' assertion that Gutierrez's INS file contains evidence of a cooperation agreement is nothing more than a shot in the dark. Defendants offered nothing to rebut the government's explicit representation to the district court that no such cooperation agreement existed. Nor were defendants able to elicit any testimony from Gutierrez or Arreguin suggesting the existence of a cooperation agreement.[8] Thus, the present case is distinguishable from cases such as *United States v. Griggs*, 713 F.2d 672, 674 (11th Cir.1983), and *United States v. Deutsch*, 475 F.2d 55, 58 (5th Cir.1973), where in each a remand was ordered for *in camera* inspection of government files based on trial testimony and out-of-court witness statements strongly suggesting the existence of *Brady* material. In *Deutsch* the government did not deny that the file contained favorable evidence. Ac-

cordingly, the district court's refusal to inspect or compel production of the INS file did not violate due process.

## III

### *Suppression of Gutierrez's Address and Place of Employment*

■ Relying on *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), and *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), defendants argue that the district court denied them the opportunity to effectively cross-examine Gutierrez, the government's "star" witness, by prohibiting counsel from eliciting his home address and place of employment. In *Alford* the district court barred as immaterial cross-examination of a key government witness as to his address even after counsel stated to the court his belief that the witness was then in federal custody. The Supreme Court held this to be an abuse of the district court's discretion to limit cross-examination and reversed. Absent any purpose to "harass, annoy or humiliate," 282 U.S. at 694, 51 S.Ct. at 220, counsel must be permitted "to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them." *Id.* at 692, 51 S.Ct. at 219.

In *Smith* the outcome of a narcotics trial hinged upon the relative credibility of the defendant and a government informant-witness. On cross-examination the trial court sustained the prosecutor's objections to revealing the witness' correct name and home address, although the jury knew that the name given during cross-examination was incorrect. The Court found a depriva-

---

**7.** The court in *Robinson* noted that "to allow the rummaging through Government files under the authority of *Brady* would be to defeat the stated legislative intent of the Jencks Act," 18 U.S.C. § 3500, which seeks to preserve the government's interest in limiting access to its files by requiring disclosure only of relevant and competent reports and statements of witnesses. 585 F.2d at 280–81.

**8.** On cross-examination Gutierrez steadfastly denied that there was a cooperation agreement or that his residency status was contingent upon working with the DEA. On cross-examination of Arreguin, counsel for Perdomo and Mugercia did not ask a single question concerning his knowledge of the 1981 deportation proceeding or of a cooperation agreement with Gutierrez. Navarro's counsel established that Arreguin had intervened in the 1981 proceeding but did not probe any further.

tion of the defendant's confrontation rights, stating:

> when the credibility of a witness is in issue, the very starting point in "exposing falsehood and bringing out the truth" [*Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965)] through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself.

390 U.S. at 131, 88 S.Ct. at 750.

■ *Alford* and *Smith* thus make it clear that a defendant is presumptively entitled to cross-examine a key government witness as to his address and place of employment.[9] These authorities do not, however, require a new trial whenever such cross-examination is restricted. As stated in *United States v. Teller*, 412 F.2d 374, 380 (7th Cir.1969), "the initial question is whether the defendant was denied effective cross-examination." *See United States v. Qualls*, 500 F.2d 1238, 1241 (8th Cir.), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); *United States ex rel. Abbott v. Twomey*, 460 F.2d 400, 403–04 (7th Cir.1972); *United States v. Lee*, 413 F.2d 910, 915 (7th Cir.1969), *cert. denied*, 396 U.S. 1022, 90 S.Ct. 595, 24 L.Ed.2d 515 (1970).

> The critical question is not simply whether or not the witness has divulged his home address, information that admittedly could sometimes lead to facts relevant to contradiction or impeachment, but whether or not the defendant has been given sufficient "opportunity to place the witness in his proper setting."

*United States v. Alston*, 460 F.2d 48, 51–52 (5th Cir.), *cert. denied*, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972) (quoting

*Alford*, 282 U.S. at 692, 51 S.Ct. at 219). Placing the witness "in his proper setting," of course, is only one aspect of effective cross-examination, which entails permitting defense counsel "to expose the facts from which the fact-finder can draw inferences relating to the reliability of the witness. Counsel must be able to make a record from which to argue why the witness might be biased." *United States v. De Gudino*, 722 F.2d 1351, 1354 (7th Cir.1983); *United States v. Fitzgerald*, 579 F.2d 1014, 1021 (7th Cir.), *cert. denied*, 439 U.S. 1002, 99 S.Ct. 610, 58 L.Ed.2d 677 (1978).

The rather sensitive issue in this case is whether defendants' inability to cross-examine the chief government witness regarding his home address and place of employment requires a new trial. The answer to this question depends on whether suppression of this information emasculated the defendants' right of cross-examination by restricting counsel's opportunity to impeach Gutierrez's credibility and thus denied defendants a fair trial. We turn then to the circumstances under which the district court's ruling was made.

■ The district court gave as its reason for suppression that disclosure of Gutierrez's place of employment and home address would have a serious impact on his usefulness as an informant in the continuing investigation of narcotics cases. Standing alone, on the present record we need not decide whether this would be a sufficient reason for suppression, although the impact of disclosure on Gutierrez's secretive and dangerous role as an informant in on-going narcotics investigations is certainly a factor to be considered. There are other circumstances to be considered, however. The district court examined Gutierrez's employee badge and viewed his address *in camera* and determined that the information, unlike cases such as *Alford*, had no relevance to the issues at trial. Indeed, Mugercia's counsel expressly stat-

---

**9.** Cases applying *Alford* and *Smith* have not distinguished between a witness' address and place of employment, although those two cases did not involve the latter. *See, e.g., United States v. LaBarbera*, 463 F.2d 988 (7th Cir.1972); *United States v. Palermo*, 410 F.2d 468 (7th Cir. 1969).

ed that he did not consider the information relevant in and of itself. The court did permit counsel to ask Gutierrez his city of residence, type of employment, and general location of his employer within the city. Gutierrez then disclosed that he lived in Chicago and worked for a security agency in South Chicago. Moreover, defendants' counsel failed to engage in any substantial exploratory cross-examination relating to Gutierrez's residence and employment even within the bounds permitted by the district court. Thus, defendants can hardly complain that the court closed off the "countless avenues of in-court examination" normally available by asking a witness "who he is and where he lives." *Smith,* 390 U.S. at 131, 88 S.Ct. at 750. Considering all the circumstances surrounding the district court's ruling, we believe that defense counsel were permitted to place Gutierrez in his proper setting for purposes of effective cross-examination.

Defendants' additional claim that they were unable to conduct out-of-court investigation without eliciting Gutierrez's address and place of employment is completely disingenuous. Perdomo testified that long before trial he had visited two of Gutierrez's home addresses as well as his place of employment. Navarro testified that he knew one of Gutierrez's home addresses. Mugercia did not take the stand, hence we cannot be sure as to his knowledge. Nevertheless, under the circumstances of this case it is reasonable to infer communication of the pertinent information within the defense camp. Even without this inference, we can hardly fault the district court for not taking seriously counsel's offer to "scurry around" during the relatively brief trial to interview neighbors and witnesses.

From the overall context of Gutierrez's cross-examination it is clear that defendants were able to place before the jury ample testimony upon which it could make a discriminating appraisal of Gutierrez's motives and biases. *See United States v. De Gudino,* 722 F.2d at 1354. The details of Gutierrez's criminal record, immigration problems, and relationship with the DEA need not be repeated. *Ante* at 628–629. Suffice it to say that defense counsel questioned Gutierrez at length about these matters in their vigorous efforts to persuade the jury not to credit his testimony. We thus conclude that defendants had ample opportunity to avail themselves of their Sixth Amendment confrontation rights and that they obtained a fair trial.

### IV

### *Entrapment*

■ The principal issue on appeal is the asserted defense of entrapment, about which we have recently written.[10] In *United States v. Thoma,* 726 F.2d 1191, 1196 (7th Cir.1984), we noted that "the defense of entrapment focuses upon whether the Government's actions implanted the criminal design in the mind of an otherwise unpredisposed person." *See Hampton v. United States,* 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976); *United States v. Russell,* 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973). "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958). "[U]nless it can be decided as a matter of law, the issue of whether a defendant has been entrapped is for the jury as part of its

**10.** *See United States v. Thoma,* 726 F.2d 1191 (7th Cir.1984); *United States v. Kaminski,* 703 F.2d 1004 (7th Cir.1983). For earlier cases within this circuit dealing with the issue of entrapment, *see United States v. Fields,* 689 F.2d 122 (7th Cir.), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935 (1982); *United States v. Hinkle,* 637 F.2d 1154 (7th Cir.1981); *United States v. Guevara,* 598 F.2d 1094 (7th Cir.1979); *United States v. Garcia,* 562 F.2d 411 (7th Cir.

1977); *United States v. Townsend,* 555 F.2d 152 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977); *United States v. Spain,* 536 F.2d 170 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976); *United States v. Cardi,* 478 F.2d 1362 (7th Cir.), *cert. denied,* 414 U.S. 852, 94 S.Ct. 147, 38 L.Ed.2d 101 (1973); *United States v. Georgiou,* 333 F.2d 440 (7th Cir.), *cert. denied,* 379 U.S. 901, 85 S.Ct. 191, 13 L.Ed.2d 176 (1964).

function of determining the guilt or innocence of the accused." *Id.* at 377, 78 S.Ct. at 823 (footnote omitted). Entrapment is established as a matter of law "only when the lack of predisposition is apparent from the uncontradicted evidence." *Thoma,* 726 F.2d at 1197; *Sherman,* 356 U.S. at 373, 78 S.Ct. at 821; *United States v. Kaminski,* 703 F.2d 1004, 1007 (7th Cir.1983); *United States v. Spain,* 536 F.2d 170, 173 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976). Defendants in the present case contend that the government has failed to shoulder its burden of proving beyond a reasonable doubt that the defendants were predisposed to commit the offenses.[11]

With this contention we cannot agree. As we observed in *Kaminski,* "there is no infallible means of divining a defendant's predisposition to commit a crime after the fact" because predisposition is, "by definition, 'the defendant's state of mind and inclinations before his initial exposure to government agents.'" 703 F.2d at 1008 (quoting *United States v. Jannotti,* 501 F.Supp. 1182, 1191 (E.D.Pa. 1980), *rev'd on other grounds,* 673 F.2d 578 (3d Cir.), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)). Nevertheless, there are certain guidelines which have been recognized as helpful in determining the defendant's state of mind:

> (1) the character or reputation of the defendant; (2) whether the suggestion of criminal activity was originally made by the Government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome by Government persuasion; (5) the nature of the inducement or persuasion offered by the Government.

*Thoma,* 726 F.2d at 1197. Our review of the record, in light of these criteria, clearly indicates that the evidence of defendants' lack of predisposition was strongly contradicted by the testimony of the government's witnesses. Accordingly, the evidence did not establish entrapment as a matter of law and, viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we find the jury's verdict supported by sufficient evidence of the defendants' predisposition.

The evidence at trial established (1) defendants' prior involvement with narcotics transactions, as shown by Perdomo's introduction of Gutierrez to Elias for purposes of a cocaine sale; Navarro's statements concerning prior cocaine trafficking between Florida and Illinois; defendants' access to large quantities of cocaine; and Navarro's and Mugercia's detailed knowledge of the logistics and techniques of cocaine trafficking and familiarity with drug jargon, (2) Perdomo and not Gutierrez originally suggested the criminal activity, (3) defendants participated in the cocaine scheme for a sizeable profit, (4) defendants displayed eagerness rather than reluctance to commit the offense and there was an absence of any government overreaching, and (5) the government's inducement at most amounted to providing an opportunity to arrange the sale to Arreguin. It has long been established that "the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment." *Sherman,* 356 U.S. at 372, 78 S.Ct. at 821 (quoting *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932)).

Perdomo's and Navarro's version of the events sharply disputed the above testimony. This only serves to underscore the importance witness credibility played at trial. Indeed, it is fair to say that the trial outcome hinged upon the relative credibility of Gutierrez on the one hand and Perdomo and Navarro on the other. That, however, was a determination for the jury

---

**11.** Defendants do not challenge the jury instructions on entrapment, which properly focused on the issue of pre-existing intent.

alone.[12] "The verity that the trier of fact may and must. make credibility determinations applies with full force to entrapment issues." *United States v. Garcia,* 562 F.2d 411, 415 (7th Cir.1977); *United States v. Townsend,* 555 F.2d 152, 156 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977). Nor was the jury required to believe defendants' testimony, arguably exculpatory, to the extent not contradicted by the government's witnesses. *Masciale v. United States,* 356 U.S. 386, 388, 78 S.Ct. 827, 827, 2 L.Ed.2d 859 (1958); *Kaminski,* 703 F.2d at 1008–09; *United States v. Guevara,* 598 F.2d 1094, 1099 (7th Cir.1979). In sum, giving due respect to the jury's exclusive authority to make factual and credibility determinations, there was sufficient evidence upon which it could find, beyond a reasonable doubt, defendants' predisposition to commit the offenses for which they were convicted.

V

*Conclusion*

The evidence did not establish the defense of entrapment, nor were defendants deprived of their due process and confrontation rights by the nonproduction of Gutierrez's INS file and suppression of his address and place of employment on cross-examination. Accordingly, the judgments of conviction are AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the de-

fendants were entitled to have the district court examine the INS file of the key government witness because there was a substantial basis for claiming that it might contain material information.

My disagreement with the majority concerns the threshold the defendants must cross before they are entitled to have the court review the information they seek. The majority rejects the *Brady* claim because the defendants have not yet shown that the file contains material information favorable to the defense or that the information would have created a reasonable doubt that did not otherwise exist. In my view, this is the wrong standard to apply before the defendants have seen the file. We have here a *specific* request prior to trial, as in *Brady,* and the Supreme Court explained the prosecutor's duty in *Agurs:*

> Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed *if a substantial basis for claiming materiality exists,* it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

427 U.S. at 106, 96 S.Ct. at 2399 (emphasis supplied). Here the prosecutor turned the file over to the judge, but the judge refused to review it.[1] In this situation the same standard—"substantial basis for claiming materiality"—should apply, for where the

**12.** The defendants place great reliance on the district judge's post-verdict statement that he "had never seen a stronger defense of entrapment than was indicated by the evidence in this case." From this they argue that the judge found insufficient evidence to rebut their entrapment defense and that the judge mistakenly ruled that he had no authority to overturn the verdict on that ground. Standing alone the court's remark is somewhat quizzical. The context of the remark, however, was the denial of defendants' motions for acquittal on the ground that the court had no authority to substitute its judgment for the jury's on matters of disputed

fact and credibility. There can be no argument with that proposition.

**1.** The district court's impatience upon being asked to review the file after the trial had begun was quite understandable. However, it is far from clear that the defendants were responsible for the delay. Although the trial transcript is somewhat ambiguous, it appears that the file was subpoenaed sometime before trial, but that the government was unable to locate the file until the lunch break on the first day of trial. Tr. at 67–70.

trial judge refuses to examine the material, the defendant is in essentially the same position he would have been in if the prosecutor had failed to respond. Surely we cannot expect the defendants to prove the file contains favorable information before they have been permitted to see it.[2]

In refusing to examine the file, the district judge relied on a government attorney's representation that there was no agreement which conditioned Gutierrez' continued residence on his cooperation with the government. I doubt that the court was entitled in these circumstances to rely on the government's representation.[3] Even if reliance on the government's representations could in some cases be justified, reliance was not appropriate in this case. First, the government represented only that there was no agreement with Gutierrez; it did not represent to the court that the INS file did not contain exculpatory or impeaching information. The district court's and majority's emphasis on the presence or absence of an explicit agreement is therefore misplaced. To be useful in impeachment, the file need not show explicit promises; other information that might be in the file could prove useful in cross-examination. Whether a deal actually had been made is less significant than Gutierrez' belief or disbelief that there had been a deal, *United States v. Onori*, 535 F.2d 938, 945 (5th Cir.1976), and this witness' beliefs might be shown by circum-

stantial evidence in the file.[4] Second, the government attorney who represented that no deal existed also said he was not familiar with basic facts in the file. When he was asked about the content of DEA Agent Arreguin's testimony at the INS hearing (perhaps crucial information), the attorney said he did not know who had testified at the hearing.

Applying the correct standard where the court has refused to review the information, there is a substantial basis for claiming that Gutierrez' INS file might contain significant impeachment information. Gutierrez' heroin conviction made him a deportable alien, and the INS sought to deport him in 1981. DEA Agent Arreguin testified on Gutierrez' behalf regarding his cooperation with the DEA, and the immigration judge waived deportability. Gutierrez testified at trial that he had thought deportation was "virtually automatic" and that he had fully expected to be deported. Most significantly, he also claimed he did not know what the DEA had done on his behalf or what Arreguin had said at the hearing. Under these circumstances, defendants are entitled to have a neutral court examine the file. I would vacate the convictions and remand to the district court for review of the material; if that review revealed information which would have provided a substantial basis for cross-examination, the defendants should receive a

**2.** The standards at issue in *Agurs* and applied by the majority here are the standards of "materiality" to be applied to evidence *after* its contents are known. 427 U.S. at 107–14, 96 S.Ct. at 2399–402. The "substantial basis for claiming materiality" standard applies to the prosecutor's duty to respond to specific requests *before* the defendant and the court have seen the evidence. 427 U.S. at 106, 96 S.Ct. at 2399.

**3.** In the closely analogous situation of a Jencks Act question, this court has insisted that after the defense counsel has raised the issue of access to a witness' statements,

> the court should dispose of it on its own responsibility based upon what it ascertains in a hearing. The court should not make a final disposition upon the representations of government counsel. It cannot escape its duty to learn the truth firsthand.

*United States v. Keig*, 320 F.2d 634, 637 (7th Cir.1963) (vacating conviction), *conviction aff'd after remand*, 334 F.2d 823, 825 (7th Cir.1964). *See Goldberg v. United States*, 425 U.S. 94, 108–09, 96 S.Ct. 1338, 1347, 47 L.Ed.2d 603 (1976) (district court must inspect documents sought under Jencks Act); *United States v. O'Brien*, 444 F.2d 1082, 1086–87 (7th Cir.1971) (vacating convictions where district court failed to review witnesses' statements under Jencks Act). *See also Korman v. United States*, 486 F.2d 926, 931 (7th Cir.1973) (requiring sworn affidavit denying use of electronic surveillance).

**4.** In this case, because Gutierrez was subjected to extended cross-examination and impeachment, I would not require a new trial if the file would have provided only cumulative impeachment material. *See Zeigler v. Callahan*, 659 F.2d 254, 266–67 (1st Cir.1981); *United States v. Mackey*, 571 F.2d 376, 389 (7th Cir.1978).

**638**

new trial. *United States v. Deutsch*, 475 F.2d 55, 58 (5th Cir.1973); *United States v. Austin*, 492 F.Supp. 502, 505–06 (N.D.Ill. 1980).[5]

I therefore respectfully dissent.

---

**5.** I note that the government's only stated reason for not producing the file was that it contained Gutierrez' address. In its brief on appeal, the government argues that the defendants already knew Gutierrez' address, so the reason for not disclosing the file now appears to be moot. Unless the government could show an-

other substantial reason for keeping the file confidential, I would not require that the district court's review of the file be *in camera*.

