**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Hubert SPAIN, Defendant-Appellant.**

**No. 75–2127.**

United States Court of Appeals,
Seventh Circuit.

Argued April 29, 1976.
Decided May 25, 1976.

John J. Wallace, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., William R. Coulson, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and CUMMINGS and TONE, Circuit Judges.

TONE, Circuit Judge.

The defendant was convicted in a jury trial of distributing controlled substances in violation of 21 U.S.C. § 841(a)(1). On appeal, he argues that entrapment was established as a matter of law and that the prosecutor's closing argument was improper. We affirm.

The defense and prosecution offered sharply differing versions of the facts. We must assume for purposes of appeal that the jury accepted the government's version, which was as follows: Drug Enforcement Administration agents learned that defendant, who operated a pharmacy on Chicago's south side, had ordered large amounts of quinine, which is not a controlled substance but which is sometimes used to dilute heroin. DEA Agent Kenneth L. Rhodes called defendant by telephone and, without identifying himself, said he wanted to talk to defendant about "some Q," meaning quinine. Defendant told him to come to the pharmacy. Rhodes did so the next day and offered to trade quinine for "uppers . . . . That is some fat pills." Defendant said he could get as much didrex, a controlled substance, as Rhodes wanted. Defendant examined bottles of quinine Rhodes had brought with him and asked whether Rhodes had any sealed bottles. Rhodes replied that he did.

The next day Rhodes again called defendant and agreed on the specific terms of a barter of quinine for didrex tablets. That afternoon the transaction was consummated, future barters were discussed, and it was arranged that a messenger, who turned out to be Agent Kenneth Labik, would handle future transactions on behalf of Rhodes.

Subsequent transactions during the next month followed the same pattern, except that in some instances controlled substances other than didrex were received for the quinine. The last of these transactions was initiated by defendant, who telephoned Agent Labik and said he "had 500 tablets of didrex for sale for 50 ounces of quinine" and agreed to meet Labik in a parking lot to make the exchange. At that meeting defendant delivered the didrex to Labik and was immediately thereafter arrested. After being duly informed of his constitutional rights, defendant at first said he was using the quinine to prepare a hair product, but then admitted that he was selling it to narcotics dealers. There was no evidence of other prior criminal activity by defendant.

Defendant's version of the facts was markedly different from that of the agents. He testified that, in their first meeting, Rhodes identified himself and "said that he wanted to catch this white fellow and his friends that are selling, pushing pills to the black kids in the community and he needed my cooperation." Defendant testified that he at first declined but after being threatened with harassment agreed to cooperate, following which Rhodes gave him pills with instructions to give them to the suspected pusher in return for quinine. Defendant's account of the conversation was corroborated by a witness who testified that he overheard it while repairing a stamp machine nearby.

Later, defendant testified, a stranger delivered to him at the pharmacy a package containing controlled substances which he later delivered to Labik in exchange for quinine. This was corroborated by a witness who testified that he was sitting in an automobile smoking a marijuana cigarette when three men approached him and told him they were police and would arrest him unless he delivered a package to the pharmacy of defendant, whom he did not know, and that he then delivered the package.

Defendant's account of the arrest also differed sharply from the accounts of the

agents. He testified that a dirty cigar picked up from the ground was shoved into his mouth by one of the agents, that the agents threatened to kill him, and that one held a gun to his head. He denied making any admission to the agents. These assertions were first made at the trial. No motion to suppress was ever made. The agents testified that they did not assault or threaten defendant.

There were other disputed issues of fact of less significance, such as whether quinine is difficult to obtain in large quantities and whether defendant had a legitimate use for quinine in connection with experiments he was conducting to develop a hair grooming product. The jury was justified in resolving these issues, like the other factual issues, against defendant.

### 1.

■ We can quickly dispose of defendant's argument that the testimony of the agents was inherently incredible because it was conflicting with respect to details of the arrest. Agent Weinstein testified that he and Labik "had guns" on defendant (who was armed) and that defendant admitted using the quinine to dilute heroin seconds after saying he was using it for a hair preparation. Labik testified that he "never placed a gun on" defendant and that defendant changed his story after 20 minutes of conversation. The jury could have found that these discrepancies, which concerned collateral matters, were the result of mistake. Inconsistencies in the government case do not require an inference that the government agents perjured themselves. *Chapman v. United States*, 408 F.2d 11, 12 (2d Cir. 1969). Even if the jury found that an agent had deliberately testified falsely on a collateral matter, it could still accept the substance of his testimony on the issues

in the case. See *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969), *cert. denied*, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530; *Wyatt v. United States*, 263 F.2d 304, 308 (5th Cir. 1959), *affirmed* 362 U.S. 525, 80 S.Ct. 901, 4 L.Ed.2d 931 (1960).

### 2.

■ The defense of entrapment is available when a defendant who was induced to commit an offense by government agents had no predisposition to commit the offense. *United States v. Russell*, 411 U.S. 423, 433–436, 93 S.Ct. 1637, 1643–1645, 36 L.Ed.2d 366, 374–375 (1973); *United States v. Perry*, 478 F.2d 1276, 1278 (7th Cir. 1973), *cert. denied*, 414 U.S. 1005, 94 S.Ct. 363, 38 L.Ed.2d 241. A corollary of this principle is the rule that "mere solicitation" by government agents "is not enough to show entrapment." *United States v. Perry, supra*, 478 F.2d at 1278; accord, *Kadis v. United States*, 373 F.2d 370, 374 (1st Cir. 1967); and see *Lewis v. United States*, 385 U.S. 206, 208, 87 S.Ct. 424, 425, 17 L.Ed.2d 312, 314 (1966).*

■ Entrapment is established as a matter of law only when the absence of predisposition appears from uncontradicted evidence. In the case at bar the evidence bearing on the issue of predisposition was in conflict, and that issue was therefore properly submitted to the jury. The evidence from which the jury could properly have found predisposition included defendant's ready response to the solicitation, *United States v. Viviano*, 437 F.2d 295, 299 (2d Cir. 1971), his initiation of the final transaction, on which one of the counts of the indictment was based, and his admission that he was distributing quinine to narcotics dealers for use in diluting heroin. The defense of entrapment was properly submitted to

---

* It has been held that proof of solicitation imposes on the government the burden of proving propensity, *United States v. Jones*, 360 F.2d 92, 96 (2d Cir. 1966), *cert. denied*, 385 U.S. 1012, 87 S.Ct. 721, 17 L.Ed.2d 549; but see Hays, J., dissenting in *United States v. Riley*, 363 F.2d 955, 959–961 (2d Cir. 1966); but propensity can be shown by the defendant's ready response to the solicitation, *United States v. Viviano*, 437 F.2d 295, 299 (2d Cir. 1971). It is unnecessary to decide whether to follow the Second Circuit's burden-of-proof rule, not only because no point concerning burden of proof is made in the case at bar, but because the trial judge instructed the jury, in substance, that the government was required to prove predisposition beyond a reasonable doubt.

the jury, and the jury was justified in rejecting the defense.

3.

■ We turn now to the issue of whether the prosecutor's closing argument, to which (with one irrelevant exception) no objection was made, was so prejudicial as to amount to plain error under Rule 52(b), Fed.R. Crim.P. Since irreconcilable conflicts in the evidence could not have been the result of honest mistake, each counsel was of course entitled to argue that witnesses called by him had spoken the truth and those called by the other side had testified falsely. There was no other way to argue the case effectively. Urging the jury to believe the government witnesses' testimony did "not constitute a vouching for the credibility of the witnesses nor an indication of the prosecutor's personal belief or opinion as to guilt of the defendant." *United States v. Verse*, 490 F.2d 280, 282 (7th Cir. 1973), *cert. denied*, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974).

■ That the arguments attacking the credibility of opposing witnesses could have been made with more decorum by the prosecutor is an understatement. We shall have more to say about that later. But counsel for the defendant, instead of objecting, chose to respond in kind. As he said in response to a prosecution objection during his argument, "I didn't interfere with yours. Will you please let me speak because it is against you, counsel?" If counsel for defendant had objected when the first offensive statement was made by the prosecutor, the trial judge would presumably have corrected that error and prevented its recurrence not only during the argument of the prosecutor but, upon proper objection, during the argument for the defense as well. Instead of objecting, counsel for the defendant made an argument that was more offensive than the prosecutor's. The inference of tactical choice is unavoidable. We think that the defendant was not prejudiced by what occurred. The jurors must have understood that the version of one side or the other was false, and they were not

likely to have been influenced in deciding which it was by the manner in which the assertions of falsehood were expressed in counsel's arguments.

Although we do not find plain error, neither do we condone the prosecutor's argument. By way of a background to what we have to say on this subject, it should be observed that judges have differed about the boundaries of legitimate prosecutorial oratory. Judge Learned Hand said over fifty years ago, "To shear him [the prosecutor] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice. . . ." *DiCarlo v. United States*, 6 F.2d 364, 368 (2d Cir. 1925). In *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the Supreme Court reversed the Second Circuit on the ground of prosecutorial misconduct, including a closing argument which Judge Hand had said "failed in moderation and good taste" but was not so gravely offensive as "to compromise its [the trial's] essential fairness." *United States v. Berger*, 73 F.2d 278, 279, 280 (2d Cir. 1934). While the Supreme Court described the closing argument as "containing improper insinuations and assertions calculated to mislead the jury," which included assertions as to the prosecutor's personal knowledge, the Court also criticized the argument as "undignified and intemperate." 295 U.S. at 85, 55 S.Ct. at 633, 79 L.Ed. at 1320.

In another appeal decided shortly after the Supreme Court's decision in *Berger*, the Second Circuit, per L. Hand, J., noted that in view of that decision it "felt bound to look somewhat jealously for any abuse of his position by the prosecuting attorney," yet sustained a conviction despite an argument by the prosecutor that was "at times . . . certainly denunciatory." *United States v. Wexler*, 79 F.2d 526, 529, 530 (2d Cir. 1935), *cert. denied*, 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991. Judge Hand said:

"It is impossible to expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion. Courts make no such de-

mand; they recognize that a jury inevitably catches this mood and that the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture, while the defense is allowed those appeals in misericordiam which long custom has come to sanction. The question is always as to the particular incident challenged, in the setting of the whole trial." 79 F.2d at 529–530.

The prosecutor's argument in *Wexler*, unlike that in *Berger*, did not contain improper insinuations or assertions. Because the argument was "supported by the evidence or by reasonable inferences from it," the court would not reverse merely because it contained "rhetoric [which] seems to us intemperate and feeble," but which "cannot be said to step beyond limits permissible to those who like it." *Id.* at 530.

Some years later Judge Evans of this court sustained the right of the prosecutor to "speak frankly, vigorously and effectively concerning the unfavorable facts, or to draw therefrom legitimate conclusions, unpleasant and embarrassing to the accused . . . ." He added,

"The district attorney is quite free to comment legitimately and to speak fully although harshly upon the action and conduct of the accused, if the evidence supports his comments, as is the accused's counsel to comment upon the nature of the evidence and the character of the witnesses which the Government produces and which is favorable to him." *United States v. Freeman*, 167 F.2d 786, 791 (7th Cir. 1948), *cert. denied*, 335 U.S. 817, 69 S.Ct. 37, 93 L.Ed. 372.

In more recent times this court has held a prosecutor's reference to statements of a defendant as "lies" to be proper argument. *United States v. Isaacs*, 493 F.2d 1124, 1166 (1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146. "Lies" was found permissible but "perjured" was said to be "rather ill-considered" in *United States v. Jansen*, 475 F.2d 312, 317 (7th Cir. 1973). A prosecutor's argument which, among "a host of infirmities," included a characteriza-tion of the defense as one which the jury would "have to be born yesterday to believe" and as "riddled with lies," a "pack of lies," "an insult to your intelligence," and "concocted," was held by the Second Circuit to be sufficiently prejudicial, in combination with an incorrect instruction to the jury, to require a new trial in *United States v. Gonzales*, 488 F.2d 833, 836 (1973).

In the case at bar the prosecutor repeatedly described the defense as "concocted," "fabricated," "contrived," "tailored," "perjured," and "a lie." The defendant was said to be "trying to . . . frame" the government by "bringing you this perjured testimony." A defense witness was characterized as a "liar" and said to have given "lie testimony." All this may have been literally true, and yet it was not proper argument. We do not say that the use of any of these expressions is improper in all circumstances; but their emotive and pejorative connotations tend to impair the calm and detached search for truth to which a criminal trial should aspire, and they should ordinarily be avoided. We can add that their injudicious and excessive use is likely to be self-defeating, repelling jurors instead of convincing them.

The prosecutor also told the jury several times that the defendant was attempting "to sell you the Brooklyn Bridge." It should be unnecessary for us to say that this hackneyed metaphor had no place in the courtroom.

Nothing we have said is intended to discourage a prosecutor from vigorous argument or frank comment on the evidence or the character of a witness. The line between the "undignified and intemperate" (*Berger v. United States*, 295 U.S. at 85, 55 S.Ct. at 632, 79 L.Ed. at 1320) and the "hard" (*id.* at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321) or "harsh" (*United States v. Freeman*, 167 F.2d at 791) but fair, is not susceptible of ready definition. It can only be located through a sense of fitness and taste and an appreciation of the prosecutor's proper role (*Berger*, 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321). Those who cannot discern

that line with confidence had best stay a safe distance away from it.

■ Defendant also complains of the following statement made by the prosecutor in responding during rebuttal to the defense's entrapment argument:

"Agents of the federal government do not make those kind [sic] of cases unless, in fact, there is the evidence. Once the evidence is there, most certainly the case is made."

This was grossly improper. There was, however, no objection. If there had been, the trial judge would presumably have suitably admonished the prosecutor for his misconduct and advised the jury that no such inference could be drawn. The trial judge later properly instructed the jury of the presumption of innocence and the limited function of an indictment, and admonished them that the indictment is not evidence of guilt and they must not be prejudiced against the defendant because an indictment was returned against him. After having carefully considered the prosecutor's statement in the context of the entire record, we are persuaded that it was not plain error.

■ The records before us recently have too often disclosed prosecutorial arguments which, while not rising to the level of plain error, were nevertheless improper. If this continues, this court may find it necessary in appropriate cases to exercise its supervisory authority, even in the absence of plain error. In the future all federal prosecutors in this circuit will confirm their arguments to the standards set by the Supreme Court in the *Berger* case.

AFFIRMED.