**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William LEVY, Defendant-Appellant.**

No. 83–2010.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1984.

Decided Aug. 2, 1984.

Certiorari Denied Nov. 13, 1984.

See 105 S.Ct. 440.

Carol A. Brook, Federal Defender Program, Chicago, Ill., for defendant-appellant.

Alexander S. Vesselinovitch, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER, Circuit Judge, PELL, Senior Circuit Judge, and JAMESON, Senior District Judge.*

PELL, Senior Circuit Judge.

William Levy, defendant-appellant, was convicted of fifteen counts of violating 18 U.S.C. § 657, which proscribes the willful misapplication of bank funds. Appellant was sentenced to one year's service in a work release program, five years' probation, and he was ordered to make restitution in the amount of $144,000. Appellant raises eight issues on appeal, each of which he contends requires reversal of his conviction. First, appellant claims that the indictment was fatally defective. Appellant then raises two arguments concerning the sufficiency of the evidence. Next, appellant contends that remarks in the prosecutor's closing argument caused the jury to allocate incorrectly the burden of proving the elements of the crime charged. Finally, appellant contends the trial judge improperly admitted four types of evidence. Although the focus at oral argument was only on two of the issues, we address each issue in turn.

## I. FACTS

■ The first challenge, being to the sufficiency of the evidence, requires a more detailed recital of facts than is ordinarily necessary. The charges in this case arose out of a series of mortgage transactions involving the firm Financial Resources, Inc. (Financial), a corporation of which appellant was president and sole shareholder from September 1978 through August 1981. In September 1979, Financial and the First Financial Savings & Loan Associ-

ation of Downers Grove, Illinois (the Association)[1] executed a document entitled "Agency Agreement" under which Financial would do preliminary investigative work requisite to the Association's securing from the Veterans Administration (VA) or Federal Housing Administration (FHA) insurance on mortgage loans made to eligible individuals. Financial entered this arrangement because its own net worth was insufficient under VA and FHA guidelines to qualify as a principal lender.

As the Association's agent, Financial received applications for VA- or FHA-insured mortgage loans from prospective borrowers. Financial took an application fee from each prospective borrower, part of which covered the cost of a credit check and employment verification, both of which VA and FHA required prior to issuing a loan approval. The application fee also included an "appraisal fee," which Financial forwarded to an appraiser after he satisfactorily performed the task of valuing the property that was to secure the mortgage loan. Financial apparently held the appraisal fee in trust, and it was obliged to remit the funds held upon completion of the appraisal.

In a typical transaction, Financial assembled all the documentation required by VA or FHA and then sent a completed loan file to the appropriate one of those two organizations. VA or FHA then evaluated the loan file and issued a loan approval or disapproval. In the case of a loan approval, Financial notified the Association, which then transferred the funds required for the mortgage loan to an account set aside for Financial. Financial next drew a check on that account for the amount of the mortgage loan, payable to the title company involved in the closing. The title company in turn disbursed the mortgage funds in accordance with written instructions Financial provided.

---

* Honorable William J. Jameson, Senior District Judge of the District of Montana, sitting by designation.

1. The accounts of the Association are insured by the Federal Savings and Loan Insurance Corporation. Such insurance is a sufficient condition for the application of Section 657 to this type of institution.

When an appraiser determined that property which might secure a loan required repairs, VA or FHA generally insisted that those repairs be undertaken before issuing a loan approval. In a few cases, however, the VA or FHA dispensed with its requirement of prompt repair. In these special cases, the borrower usually desired to close the transaction before repairs could practically be made. Even in these cases, however, the VA or FHA protected itself by requiring the lender to set up an escrow account with part of the loaned funds. The repair escrow arrangement ensured the VA or FHA that needed repairs would satisfactorily be undertaken. The escrow agreement provided that the escrow agent could not pay out the funds to the seller or repair contractor until a VA or FHA representative ascertained that the repairs had been performed properly.

The moneys which the jury found Levy had willfully misapplied were fifteen repair escrow funds. Barbara Arms, Assistant Secretary of the Association testified at appellant's trial about the closing procedures used to establish repair escrow accounts. According to Arms, closings involving repair escrow accounts resembled regular closings in all respects, except that the title company would withhold a designated portion of the loan from the seller and issue a check to Financial for that portion. Arms further testified that in December 1979, shortly after the Association established the agency relationship with Financial, she instructed officers at Financial to endorse each repair escrow check they received over to the Association and then forward it, along with the file for the closed transaction, to the responsible department at the Association. Arms stated this was the very same procedure the Association followed with all its agents, and she also stated that this practice conformed to standard procedures used in the mortgage banking industry. Once the Association received the repair escrow check, it deposited the check in a "Restricted Escrow Loan Account," from which funds could be drawn only upon receiving authorization from the VA or FHA. For several months,

Financial followed the standard procedure that Arms described. Sybille Harlan, the Closing Manager for Financial, testified, however, that after this initial period of compliance, Levy instructed his employees at Financial to deposit the repair escrow checks they received from title companies at closings directly into either Financial's general business account at the Villa Park Trust and Savings Bank or into an account generally used for appraisal fees at the Woodfield Bank. Agent Charles Peters of the FBI testified about Financial's change in procedures for handling repair escrow checks. Peters related the contents of an interview with appellant in which Levy stated the change came about at the request of the Association. The Association no longer wanted to keep the funds, but it failed to give Financial new instructions for the handling of repair escrow checks. Appellant, left without instructions, simply deposited the checks into Financial's general business account and used the funds to meet business expenses. Arms' testimony casts doubt on the veracity of appellant's statement concerning the Association's order to stop forwarding the repair escrow checks. She expressed surprise upon learning that Financial had departed from the instructions she issued in December of 1979. Harlan's testimony likewise tends to discredit appellant's explanation for the change in forwarding procedures. She stated that she never received instructions from the Association to stop forwarding the repair escrow checks.

By May 1981, Harlan testified, Financial received an average of one or two complaints each week from buyers, sellers, and evidently impatient contractors concerning unpaid and owing repair escrow funds. Whenever Harlan received such a complaint she conveyed it to appellant who instructed Harlan never to send out repair escrow payments without his approval. Phyllis Rogers, Chief of Mortgage Credit for the FHA in Chicago, testified that she met with appellant in late June or early July of 1981 and discussed the matter of the overdue repair escrow funds. Appel-

lant told Rogers that there had been some clerical errors at Financial and that those errors would be corrected in due course.

On July 22, 1981, Arms paid a deliberately unannounced visit to the offices of Financial at the request of the Association's president. Arms testified that she randomly selected about thirty loan files and discovered that in the case of five or six loans a title company had issued a check to Financial for a repair escrow fund. Arms demanded payment for the unremitted repair escrow funds, and appellant complied. Arms then asked appellant whether Financial had failed to forward the Association any repair escrow checks besides the five or six she discovered. Appellant replied he had no additional repair escrow checks. Arms then instructed appellant that he was in the future to notify the Association about all loans involving repair escrow funds. Appellant agreed to comply with this procedure.

One day earlier, on July 21, 1981, Financial had closed a VA-insured loan for Mr. Gerald Davis, a loan for which the title company had set aside repair escrow funds. On or after July 25, 1981, Financial forwarded the Davis file to the Association, but it did not send with it the repair escrow check it had received from the title company. The file did contain a copy of an HUD-1 form, which is an official settlement statement. The Association's copy of the HUD-1 form, however, failed to indicate that repair escrow funds were involved in the loan transaction. In August 1981, the Association obtained from the VA a certified copy of the original HUD-1 form, and that copy showed that $5,000 of the loan proceeds had been set aside for a repair escrow fund. The Gerald Davis loan was the subject of Count Six in the indictment against appellant.

In late August or early September of 1981, appellant voluntarily took twenty-nine loan files to Arms at the Association's offices. Appellant told her that each of the twenty-nine loans involved repair escrow accounts, but that he had no money to pay for them. All of the fifteen loans describ-

ed in the indictment were among the twenty-nine appellant revealed to Arms. Thirteen of the fifteen loan transactions were closed prior to Arms' unannounced visit to Financial's offices on July 22. The two others were closed between July 22 and August 24 of 1981.

In December of 1981, Agent Peters of the FBI reviewed all of Financial's and appellant's bank accounts and estimated that in September 1981 those accounts had a cumulative total balance of $1,000. Financial's account records at the Woodfield Bank showed that appellant in August 1981 drew a check in the amount of $1,400 payable to him for vacation pay. Harlan testified that the Woodfield account had never been used for vacation pay prior to July 31, 1981. The total amount of the fifteen repair escrow accounts charged in the indictment was over $125,000. Although appellant indicated he might indemnify the Association for the missing repair escrow funds, whether because of inability or otherwise, he did not do so, and the Association used its own moneys to pay the proper parties for the repairs undertaken.

## II. DISCUSSION

### A. Insufficiency of the Indictment for Failure to Charge an Offense Under 18 U.S.C. § 657

■ In the first in a series of direct challenges to his conviction, Levy claims that the indictment is fatally defective because it fails to allege all the elements of a crime under 18 U.S.C. § 657. The fifteen counts of the indictment differ only in their description of money amounts, dates, and borrowers. In all other respects, the counts recite identical language, which reads in pertinent part as follows: "[Defendant] doing business as Financial Resources, Inc., an agent of First Financial Savings and Loan Association, with intent to injure and defraud said savings and loan association, did embezzle and willfully misapply certain monies and funds belonging to and entrusted to the custody and care of said savings and loan association, in that defendant did embezzle and willfully misap-

ply [dollar amount], which money had been entrusted to Financial Resources to establish a repair escrow in the connection with the issuance of a mortgage loan ...." It is appellant's theory that conversion is an essential part of the activity made criminal under Section 657, and that the indictment fails because it does not allege conversion.

Appellant bases his argument upon *United States v. Britton*, 107 U.S. 655, 2 S.Ct. 512, 27 L.Ed. 520 (1882), in which the Supreme Court considered the sufficiency of an indictment charging an offense under a predecessor statute to Section 657. The Court held that an indictment that only charged the defendant with "willful misapplication of bank funds with intent to injure and defraud the bank" was not sufficient. The Court reasoned that the term "willful misapplication" meant more than the mere handling of bank funds in violation of technical banking rules. The term meant appropriation of bank funds to one's own use or to the use of some person or entity other than the bank. Since appropriation of bank funds to Britton's use or the use of another was not averred in the counts of the indictment, the indictment was fatally defective.

In the instant case, it is plain that the indictment is sufficient under the *Britton* standard. The indictment returned by the grand jury charged that appellant "did embezzle and willfully misapply" a sum certain of bank funds. Embezzlement and misapplication are given in the conjunctive, meaning that the grand jury believed appellant did both. Since appropriation to one's own use is an essential element of embezzlement, it is evident that the grand jury determined that appellant did the proscribed act of appropriating bank funds to his use. The fact that the indictment was written in the conjunctive forecloses the possibility that the grand jury believed appellant had not appropriated the funds to his own use, and the indictment thus properly charged appellant with an offense under the "willful misapplication" provision of Section 657. *See United States v. Watkins*, 709 F.2d 475, 478 (7th Cir.1983).

Although appellant does not raise the point, we note that when the trial judge instructed the petit jury, he stated that appellant would have committed an offense if he either embezzled *or* willfully misapplied funds. The judge explained in his instructions, however, that "misapplied" meant "the unlawful taking or conversion by a person to his own use or the use of someone else." Thus, the jury could not have convicted Levy of willfully misapplying bank funds without also finding that he converted those funds to his own use.

B. **Insufficiency of the Evidence to Show That the Repair Escrow Funds Either Belonged to or Were Entrusted to the Care of the Association**

Section 657 proscribes the willful misapplication of "moneys, funds, credits, securities or other things of value belonging to such [savings and loan association], or pledged or otherwise intrusted to its care." Appellant claims there was insufficient evidence at trial to show that the repair escrow funds belonged to or were entrusted to the care of the Association. Appellant bases this argument upon excerpts from the testimony of two Government witnesses. Maurice Crowley, Chief of Loan Processing at the VA, engaged in the following colloquy with defense counsel:

Q: Whose money was the escrow payment. Whose money was that check?

A: Technically, it's the seller's money.

Q: That check just happens to be cut by the title company to facilitate the closing, is that correct?

A: That's correct.

Barbara Arms testified on direct examination:

Q: What does a Repair Escrow do? What assurance does that provide FHA or VA?

A: That there's money set aside in order to complete those repairs in a timely manner and because the appraisal was issued subject to those repairs being done.

Q: Where does the Repair Escrow money come from?

A: It's a portion of the seller's proceeds or less.

Q: Where do the seller's proceeds come from?

A: From First Financial Savings and Loan.

 At the outset of evaluating appellant's claim, we note that an appellate court reviewing the sufficiency of evidence in a criminal case must reject appellant's challenge if, after considering all of the evidence "in the light most favorable to the government," it concludes that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Viewing the evidence adduced at trial in the instant case under the above standard, it is plain that appellant's challenge to his conviction cannot succeed.

 The bulk of the evidence adduced at trial supports the finding that each seller had at the time of closing no more than an equitable interest in the repair escrow funds. It is the equitable interest that most likely underlay Crowley's and Arms' statements to the effect that the funds were "the seller's money." The jury heard testimony from several witnesses, including Arms, that the *very purpose* of the escrow arrangements was to keep certain moneys from the sellers until designated repairs were performed to the satisfaction of VA or the FHA. If the repairs were not properly made, the seller would not be entitled to receive any of the repair escrow moneys. To believe that the escrow funds were "the seller's money," the jury would have had to ignore the great bulk of the testimony concerning the function of the repair escrow arrangement. The evidence at trial thus amply supports the theory that the Association held the repair funds for the benefit of the seller until the repairs

were properly made. The Association was a fiduciary with respect to the funds. Section 657, which speaks in terms of funds "otherwise intrusted to the [financial institution's] care," requires no more than that the savings and loan association hold the misapplied moneys in a fiduciary capacity.

 Our conclusion that the evidence showed the misapplied funds were "moneys [or] funds ... intrusted to the [Association's] care" does not change merely because the funds never came into the possession of the Association. Appellant was an agent of the Association, and as such he cannot escape liability under Section 657 by claiming that the misapplied funds were never entrusted to the care of an institution described in the statute. Financial attended closings in order to collect repair escrow checks for the Association, and it is firmly established in the case law that an agent cannot evade the application of the statute by his own act of converting funds he receives for his principal. *See, e.g., Groves v. United States,* 343 F.2d 850 (8th Cir.1965) (bank manager liable under Section 657 where he converts customer's deposit check to his own use). Funds in the hands of an agent are imputed to the possession of the principal, *id.,* and the agent's conversion of the funds is thus actionable under Section 657.

C. Insufficiency of the Evidence to Show That Appellant Had the Mens Rea Requisite to Liability under Section 657

 When an agent of a banking institution misapplies banking funds, he incurs liability under Section 657 only if he acts deliberately. Mere negligence or carelessness in handling bank funds will not satisfy Section 657's mens rea requirement. Section 657 implicitly requires that the agent intend to "injure or defraud" the banking institution, and that measure of intent is shown simply if "the natural tendency of [defendant's] conduct would be to injure or defraud the bank." *United States v. Krepps,* 605 F.2d 101, 104 (3rd Cir.1979),[2]

---

**2.** *United States v. Krepps* interprets 18 U.S.C. § 656. The operative language of Section 656

and Section 657, however, is identical. Sections 656 and 657 each impose criminal liability for

*quoting United States v. Schmidt,* 471 F.2d 385 (3rd Cir.1972). An actual desire to inflict harm on the bank is not required. As we stated in *United States v. Larson,* 581 F.2d 664, 667 (7th Cir.1978):

> Neither the phrase 'willfully misapplies' within § 656, nor its counterpart, 'intent to injure and defraud,' read into § 656 by the courts ... necessarily connotes an evil desire or a motive of causing injury. Deliberate misapplication of bank funds suffices, even if—as is surely the norm—the actor is motivated purely by his own self-interest or that of another and wishes no harm to anyone.

*Id., quoting United States v. Killian,* 541 F.2d 1156, 1159–60 (5th Cir.1976). The mental state of the defendant charged under Section 657 is a factual question for the jury and must be inferred from the evidence introduced at trial. *See United States v. Krepps,* 605 F.2d 101, 104 (3rd Cir.1979).

 Appellant argues that the evidence adduced at trial fails to support an inference that he possessed the mens rea requisite to liability under Section 657, but we find that argument unpersuasive. A rational trier of fact could most certainly infer from the evidence adduced at trial that appellant acted pursuant to a deliberate plan and that the natural tendency of his conduct was to injure the Association. In December 1979, Financial was instructed to endorse over and forward to the Association all repair escrow checks it received from title companies. Levy instructed his employees at Financial to disregard these instructions, and he ordered them to deposit the checks in Financial's general business and appraisal fund accounts. The Government showed at trial that Financial's employees, acting under appellant's instructions, diverted at least $125,000 of funds destined for the Association to Financial's separate accounts.[3] Some of the funds which appellant diverted were placed in an account from which a check was drawn to pay for appellant's vacation. A rational trier of fact could find based on this evidence that appellant had a deliberate plan to channel substantial sums from the Association to his use and to the use of his company. Even though appellant may have only wanted to borrow the funds and may have had the best of intentions to repay the Association, appellant exposed the Association's funds to a substantial risk of loss. The natural tendency of diverting and spending funds destined for the Association was to harm the Association.

Additional facts also support a finding of a deliberate plan and conduct which would tend to injure the Association. On July 22, 1981, appellant told Arms that the five or six repair escrow funds she discovered exhausted the repair escrow transactions currently documented in Financial's files. In fact, on the previous day Financial had closed the Gerald Davis loan. Financial had taken from the title company a repair escrow check at that closing, but appellant did not report the repair escrow fund to Arms. In addition, Financial had in its files at that time documentation for at least twenty-six other loans involving repair escrow accounts. Moreover, Financial accepted at least two more repair escrow checks after July 22 despite its promise on that date to obtain prior authorization from the Association for future repair escrow transactions. Finally, the discrepancy between the HUD-1 form sent to the Association and the form sent to the VA suggests duplicity on the part of Financial. In short, the evidence that appellant kept information from the Association once it became

---

the willful misapplication of banking funds. The principal difference between the statutes lies in the type of banking institution to which the misapplied funds must belong or be entrusted. Appellant explicitly concedes that on the issue of mens rea, cases interpreting Section 656 control Section 657 litigation.

3. We note that even if we were to believe Levy's statement concerning the Association's order to stop forwarding repair escrow checks, we would still find sufficient evidence that appellant possessed the requisite mens rea under Section 657. His deliberate spending of the money manifested an intent to injure or defraud the Association.

suspicious reasonably and convincingly gives rise to the inference that appellant acted pursuant to a deliberate plan. Although appellant may have intended no harm to the Association, a rational trier could certainly find that the natural tendency of Levy's concealment of his risky handling of the Association's funds was a detriment to the Association.

### D. Prejudicial Closing Argument

Appellant finds objectionable certain comments made by the prosecutor in his rebuttal argument to the jury. In his closing argument, appellant's counsel spoke to the jurors concerning the Government's burden to prove each element of the crime charged beyond a reasonable doubt. In pertinent part, appellant's counsel stated:

> [I]t is not the function of the prosecuting attorney, and it is not your function either, to speculate, to hypothesize, to conjecture, because when you say "maybe," "maybe he did this," or "maybe this is what happened," "maybe he intended to defraud," then the prosecutors have failed to prove him guilty beyond a reasonable doubt.

In rebuttal, the prosecutor stated to the jury:

> [Defense counsel] talked about how the government has to prove the defendant guilty beyond a reasonable doubt. It is a burden we welcome in this case. That is why we bring in the witnesses and the documents. But especially for the jurors who sat in other trials, you realize it is not an impossible burden as [defense counsel] would somehow point out and try to imply. It is not an impossible burden. It is a burden that is met every time a defendant is found guilty anywhere in this country. That certainly happens. It is a burden that the government did meet. given the evidence brought to you.

Levy argues that the prosecutor's comments improperly minimized the Government's special burden in a criminal case. The issues previously discussed in this opinion, although decided against the appel-

lant, merited respectful attention. The present issue candidly strikes us as one which, in the interest of not diluting the impact of arguably meritorious issues by a scraping-of-the-barrel approach, could well have been omitted. Nevertheless, we do examine the issue.

■ At the outset, there was no objection at the trial, no request for curative instructions, and no motion for a mistrial. Thus, under well established authority our focus is confined to whether the remarks were so prejudicial. Fed.R.Crim.P. 52(b); *United States v. Reagan*, 694 F.2d 1075, 1080 (7th Cir.1982), *cert. denied*, 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634. Upon examination of the remarks in context we not only do not regard them as "so prejudicial," but rather have difficulty in discerning any prejudice whatsoever. A jury is not a conclave of twelve philologists or a college of semanticists. It is a cross-section of the community not ordinarily engaged in the quest of hidden esoteric meanings. The phrase "beyond a reasonable doubt" is sufficiently common and well understood as not to require in this circuit a definitional instruction even though one is tendered. *United States v. Lawson*, 507 F.2d 433, 441–43 (7th Cir.1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). This, of course, is on the assumption that the jury is told that the Government must prove the defendant guilty beyond a reasonable doubt. The court's instructions did so here unambiguously.

We find nothing in the record, including the challenged remarks, which causes us to believe that the jury was unaware of the heavy burden of persuasion placed upon the Government. The challenged remarks, of course, were responsive to the above quoted portion of defense counsel's reference to the burden. We are unable to read that response as saying anything other than that in this case the burden was a welcome one because of the clearly overwhelming evidence brought to the trial by the Government. This is not a case such as *United States v. Spain*, 536 F.2d 170 (7th

Cir.1976), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976), relied on by Levy in which the prosecutors, as the defendant concedes, referred to the bases on which the Government in effect decided to bring a case, while in the present case the reference was to the evidence actually produced and heard by the jury. Even so, and notwithstanding numerous other prosecutorial remarks which the *Spain* court regarded as being questionable, there had been no objection at the trial and the judgment of conviction was affirmed. Here the comments at issue consisted of a few sentences in some 650 pages of transcript.

In sum, there simply could be no prejudice demonstrated by these brief remarks, well within permissible prosecutorial "frank comment on the evidence." *Spain, supra,* at 175.

### E. Improper Admission of Evidence

■■■ Appellant finds in the evidentiary admissions at trial a final source of error which he claims mandates reversal. In particular, appellant takes issue with the admission of testimony by Fred Bradford, a contractor, who stated he was "shocked" and "hysterical" upon learning from Arms that Financial would be unable to pay out the repair escrow funds upon which he had relied. Although appellant strenuously objects on appeal to the admission of statement concerning Bradford's dismay, defense counsel never objected at trial to Bradford's testimony, and consequently our review is limited to the identification of a mistake constituting "plain error." *See* Fed.R.Crim.P. 52(b). We agree with appellant that the contractor's state of mind upon learning he might not be paid was not germane to the issues in the case, but we cannot agree that admission of Bradford's statement affected "substantial rights" of appellant. "[O]nly the most palpable errors will be noticed on appeal when no objection has been raised below," *United States v. Edgewood Health Care Center,* 608 F.2d 13, 14 (1st Cir.1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980), and given the strength of the Government's evidence in this case, we do not believe the contractor's statement was substantially prejudicial. Again we observe that the shotgun inclusion of issues may be the basis of hitting the target with something but still runs the risk of obscuring the significant issues by dilution.

■■■ Appellant also finds error in the admission of several items of "bad act" evidence. For example, the trial judge permitted the Government to submit evidence, over objection, that appellant failed to pay appraisers after satisfactory completion of their work despite the fact that each prospective borrower gave appellant funds for such payments. This circuit, among others, has time and time again responded to the type of argument raised by appellant and should not have to do so again except in an appropriate case. *See, e.g., United States v. Wormick,* 709 F.2d 454 (7th Cir. 1983); *United States v. Serlin,* 707 F.2d 953 (7th Cir.1983); *United States v. Feinberg,* 535 F.2d 1004 (7th Cir.1976), *cert. denied,* 429 U.S. 929, 97 S.Ct. 337, 50 L.Ed.2d 300 (1977); *United States v. Braverman,* 376 F.2d 249 (2d Cir.1967), *cert. denied,* 389 U.S. 885, 88 S.Ct. 155, 19 L.Ed.2d 182. Evidence of other wrongs committed by a defendant are admissible under Fed.R.Evid. 404(b) to show "intent ... or absence of mistake or accident." *Id.* Although admissible under Rule 404(b), evidence may still be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice," Fed.R.Evid. 403. The trial judge's assessment of relative probative value and unfair prejudice is generally accorded great deference because of his firsthand exposure to the evidence and his familiarity with the course of the trial proceeding. After carefully reviewing each argument raised by appellant we are convinced that the proffered evidence was admitted to buttress the Government's case concerning the disputed issue of appellant's deliberateness, not to show that appellant was a congenital wrongdoer. Nor can we say that the trial judge abused his discretion concerning the relative probative value and prejudicial effect of the admitted evidence. We accordingly reject the

final arguments appellant makes in seeking reversal.

## CONCLUSION

Having considered the numerous arguments raised by appellant in this case, we conclude that appellant was properly convicted of misapplying bank funds under 18 U.S.C. § 657. The indictment properly charged appellant with the willful misapplication of bank funds, and the evidence at trial was sufficient to prove the elements of the misapplication offense. Moreover, the prosecutor's remarks in closing were not prejudicial and the contractor's testimony concerning his state of mind did not constitute plain error. Finally, the trial judge properly admitted evidence of other bad acts to prove that appellant acted deliberately. For these reasons the conviction of William Levy is

AFFIRMED.