**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert L. BRANTLEY,**
**Defendant-Appellant.**

**No. 84–2131.**

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1985.

Decided March 18, 1986.

---

**1324**

William T. Huyck, Chicago, Ill., for defendant-appellant.

James R. Ferguson, Asst. U.S. Atty., Anton R. Valukus, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before BAUER and FLAUM, Circuit Judges, and GRANT, Senior District Judge.[*]

GRANT, Senior District Judge.

Defendant-Appellant challenges his conviction by a jury on six counts involving a conspiracy to commit fraud against a federally funded youth program. An indictment charged defendant-appellant and co-defendant, Mosley, who was tried separately and whose appeal, No. 84–2228, was heard on the same day as the instant appeal, with one count of conspiring to commit fraud against the United States, in violation of 18 U.S.C. § 371, and one count of transporting a fraudulently obtained security in interstate commerce, in violation of 18 U.S.C. § 2314. The indictment charged defendant-appellant separately with *four counts* of knowingly causing a false statement to be made in a matter within the jurisdiction of the United States in violation of 18 U.S.C. §§ 1001 and 2. We affirm his conviction.

*Facts*

Defendant-Appellant, Brantley, and two other individuals founded a community youth organization in Chicago known as Afro Youth Community [hereinafter referred to as AYC]. Brantley and his co-founders designed AYC to serve as a diagnostic residential center for difficult-to-

place teenage boys. AYC sought funding from the Illinois Department of Children and Family Services, and that Department approved a funding proposal in April 1976. AYC leased an old mansion for its residential center and other property for office space.

After AYC received that funding, Brantley became AYC's President and Executive Director. Brantley's friend and co-defendant, Mosley, a Detroit attorney, became the Chairman of AYC's Board and served as its legal consultant. Mosley also owned the property that AYC rented.

Brantley and the other AYC founders purchased furniture on credit from Wieboldt's Department Store, a Chicago retailer, for use in the residential center. During the first year of operation, AYC experienced destruction and defacing of the furniture by the organization's teenage wards. While discussing the renewal of the contract between the Illinois Department of Children and Family Services and AYC, the Department and AYC touched upon the financial advantages of leasing rather than purchasing furniture for the residential center. Brantley and Mosley raised the leasing option with the other AYC Board members, and Mosley indicated that he would investigate various leasing firms and find a suitable candidate.

A few months later, Mosley recommended that AYC lease its furniture from National Furniture and Equipment Leasing Company [hereinafter referred to as National Furniture]. Mosley reported that National Furniture had agreed to purchase all of AYC's furniture and equipment and to lease it back to AYC. In addition, National Furniture would reimburse AYC for payments that AYC was making to Wieboldt's Department Store for the furniture and to the Hyde Park Bank for automobile loans. The Board of Directors adopted Mosley's recommendation and Mosley exe-

---

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

cuted the necessary documents with National Furniture.

Unknown to the AYC Board, Mosley had created National Furniture in July 1977 when he traveled to the home of his aunt, Ruby Alexander, in Collierville, Tennessee. Alexander agreed to assist Mosley in setting up a new business which Mosley said would help their family. Mosley drafted the legal documents for the business giving Alexander's farm as the business address. He opened a business checking account at a Collierville Bank listing Alexander and himself as the authorized signators. At Mosley's request, Alexander signed various documents and correspondence related to the AYC-National Furniture leasing agreement. Over the course of the leasing arrangement, Mosley mailed unsigned checks, drawn on the National Furniture account, to Alexander, who signed the checks and mailed them to Chicago or back to Mosley. From a discussion which took place at Mosley's wedding in Detroit in 1977, Brantley became aware of Mosley's involvement in National Furniture.

National Furniture had no warehouse, no inventory nor any sales force. It received all of its income from AYC, except for an item of some $3,000. Between September 1977, when AYC began leasing its furniture and equipment from National Furniture, and February 1980, the month that AYC lost its Department of Children and Family Services contract, AYC paid National Furniture a total of $74,341.73 for the leasing of furniture, equipment and automobiles which AYC had originally purchased for $15,968.80. Despite the money paid to National Furniture, the residential center remained inadequately furnished and in great need of replacement furniture.

Of the funds received, National Furniture reimbursed AYC for AYC's payments to Wieboldt's Department Store and Hyde Park Bank in the amount of $13,477.40. National Furniture paid Mosley $33,911.18 and Damon, Inc. a consulting firm owned by Brantley, $20,232.50. Brantley contend-

ed that the payment to Damon, Inc. was for consulting work done as research on a special wood in Ghana, Africa, and he confirmed that consulting arrangement in a June 1977 letter to Mosley. The letter gave Brantley's business address as 625 North Michigan Avenue, an address which Brantley did not occupy until July 1979.

Counts 1 and 2 of the indictment set forth the charges involving the furniture leasing fraud. Counts 4 through 7 charged Brantley with inducing four AYC employees to lie on application forms to obtain on-the-job training funds.

In 1978, the Chicago Alliance of Business [hereinafter referred to as CAB], a nonprofit organization designed to provide employment and training to economically-disadvantaged residents of Chicago, administered an on-the-job training program. Under the program, the CAB used CETA funds[1] to reimburse employers 50% of their expenses in training unemployed or disadvantaged applicants.

CAB issued its own guidelines for eligibility based upon regulations promulgated by the Secretary of Labor. Those guidelines required an applicant to have been unemployed for seven days. The Secretary of Labor's regulations allowed on-the-job training to "be used to upgrade present employees into occupations requiring higher skills." 29 C.F.R. § 95.33(d)(ii). The regulations also required that a person be, among other things, "economically disadvantaged, unemployed, or underemployed...." *Id.* § 95.32(a).

Application to the on-the-job training program involved completion of a work history and application form and a personal interview with a CAB representative. In determining eligibility, the CAB relied solely on the answers provided by the applicant.

In October 1978, Brantley met with a group of AYC employees and told them to apply for the on-the-job training funds. He instructed the employees to represent to CAB that they were unemployed and inter-

---

**1.** Comprehensive Employment and Training Act, 29 U.S.C. §§ 801–999, *repealed by* Job Training Partnership Act, Pub.L. No. 97–300, § 184(a), 96 Stat. 1322, 1357–58 (1982).

ested in working for AYC. When one of the employees objected to falsifying the application, Brantley answered, "Either you lie or you lose your job." Transcript at 29; *see id.* at 77, 197. Four employees complied with Brantley's instruction, and their applications underlie the charges in Counts 4 through 7 of the indictment.

After a jury found Brantley guilty as charged in Counts 1, 2, 4, 5, 6 and 7 of the indictment, the trial court sentenced him to twenty-six months' incarceration on Counts 1, 2 and 4, to run concurrently. Brantley received five years' probation on the three remaining counts, to run consecutively. As a condition of the probation, the trial court ordered Brantley to make restitution in the amount of $50,000. Brantley appeals.

### Issues

■ Brantley raises four issues on appeal:

I. Whether the Government failed to prove the materiality of the false statements made on the CAB applications;

II. Whether the trial court ought to have submitted the issue of materiality to the jury;

III. Whether the trial court erred by admitting evidence of matters not charged in the indictment; and,

IV. Whether the Government improperly referred to "other acts" evidence during closing argument?

---

### I. *Whether the Government failed to prove materiality of the false statements made on the CAB applications?*

The federal false statement statute, 18 U.S.C. § 1001, imposes criminal penalties on one who (1) makes a statement that (2) was false, (3) was material, (4) was made knowingly and willfully, and (5) was made in a matter "within the jurisdiction of any department or agency of the United States."

*United States v. Petullo,* 709 F.2d 1178, 1180 (7th Cir.1983) (citations omitted) (footnotes omitted). Materiality constitutes an essential element of a charge brought under 18 U.S.C. § 1001. *United States v. Bailey,* 734 F.2d 296, 305 (7th Cir.) (citations omitted), *cert. denied,* —— U.S. ——, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984). "[T]he test for materiality is whether the false statement has a tendency to influence or is capable of influencing a federal agency." *United States v. Brack,* 747 F.2d 1142, 1147 (7th Cir.1984) (citing *United States v. DiFonzo,* 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980)), *cert. denied,* —— U.S. ——, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985). The term "jurisdiction" in section 1001 has a broad meaning and "false statements need not be submitted directly to a government agency, provided that ... the agency retains ultimate authority to see that federal funds are disbursed properly." *United States v. Dick,* 744 F.2d 546, 554 (7th Cir.1984) (citations omitted); *Brack,* 747 F.2d at 1151; *Petullo,* 709 F.2d at 1180.

■ Under CETA, the Secretary of Labor had the power to allocate funds to prime sponsors, such as CAB, 29 C.F.R. § 95.3, and Regional Administrators had the responsibility of receiving, reviewing, and approving or denying a prime sponsor's grant application. 29 C.F.R. §§ 95.-16–.19. Therefore, a federal agency retained the "ultimate authority to see that federal funds [were] properly disbursed." *Dick,* 744 F.2d at 554. Any false statement made to the CAB that had a tendency or capability of influencing the Secretary or the Regional Administrator in disbursing the funds, met the materiality requirement of section 1001.

In the instant case, Brantley ordered four of his employees to lie about their employment status so that he could obtain CETA funds from CAB for on-the-job training. He told them to represent that they were unemployed when they were really working for AYC. While employers could obtain CETA on-the-job training funds to upgrade their present employees, 29 C.F.R.

§ 95.33(d)(2), the regulations limited eligibility for those funds to "[a] person who is economically disadvantaged, unemployed or underemployed...." 29 C.F.R. § 95.-32(a). The Secretary did not intend to allow broader eligibility requirements. Indeed, CETA had as its purpose the providing of "job training and employment opportunities for economically disadvantaged, unemployed and underemployed persons....". 29 C.F.R. § 94.1(a). Brantley does not argue, and the record does not indicate, that the four employees were eligible for on-the-job training funds under CETA. Therefore, the false statements had the capability of influencing a federal agency responsible for the proper disbursement of federal funds. In other words, the statements met the "material" requirement of 18 U.S.C. § 1001.

II. *Whether the trial court ought to have submitted the issue of materiality to the jury?*

■ Despite the objections of Brantley, the trial court refused to submit the question of materiality to the jury. In so doing, the trial court ruled consistently with the law in this Circuit, *United States v. Clancy*, 276 F.2d 617, 635 (7th Cir.1960), *rev'd on other grounds*, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961), and with the law of the majority of the Circuits, *see United States v. Bryant*, 770 F.2d 1283, 1290 (5th Cir.1985); *United States v. Greber*, 760 F.2d 68, 73 (3d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 396, 88 L.Ed.2d 348 (1985); *United States v. Chandler*, 752 F.2d 1148, 1150 (6th Cir.1985); *United States v. Lopez*, 728 F.2d 1359, 1362 n. 4 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984); *United States v. Richmond*, 700 F2d 1183, 1188 (8th Cir. 1983); *United States v. Bernard*, 384 F.2d 915, 916 (2d Cir.1967); *United States v. Ivey*, 322 F.2d 523, 529 (4th Cir.), *cert. denied*, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963); *Weinstock v. United*

States, 231 F.2d 699, 703 (D.C.Cir.1956).[2] This exception to the general rule that the Government must prove every element of a charged offense beyond a reasonable doubt evolved from *Sinclair v. United States*, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929). The *Sinclair* Court held that the question as to materiality of false testimony charged as perjury is a question of law. *Id.* at 298, 49 S.Ct. at 273. Because *Sinclair* continues to be good law, and because the greater weight of authority is consistent with the decision of the trial court, we persist in holding that materiality is a question of law to be decided by the judge in prosecutions under 18 U.S.C. § 1001.

III. *Whether the trial court erred by admitting evidence of matters not charged in the indictment?*

■ During cross-examination of Brantley, the Government questioned him about co-defendant Mosley's ownership of buildings leased by AYC, payments by AYC made directly to Damon, Inc., two checks totaling $15,000 issued to Brantley by AYC in 1980, and an airline ticket charged by Brantley to AYC's Diner's Club credit card in 1980. Brantley included the first three in his Motion in Limine, Record at 103, and objected to the fourth during cross-examination.

This Court has searched the record and trial transcript and finds no indication that Brantley ever obtained a ruling on his Motion in Limine regarding his request to exclude evidence of Mosley's ownership of the AYC building. A similar investigation reveals that Brantley did not object, in any way, to the Government's inquiries about AYC's landlord during cross-examination of Brantley. Failure to obtain a ruling upon a motion leaves nothing for review. *United States v. Wagoner*, 713 F.2d 1371, 1374 (8th Cir.1983) (citation omitted). Failure to object to testimony at trial limits this Court's review to "the identification of a

---

**2.** Two Circuits have held that the question of materiality in prosecutions under 18 U.S.C. § 1001 are questions for the jury. *United States v. Irwin*, 654 F.2d 671, 677 n. 8 (10th Cir.1981),

*cert. denied*, 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982); *United States v. Valdez*, 594 F.2d 725, 729 (9th Cir.1979).

mistake constituting 'plain error.' " *United States v. Levy,* 741 F.2d 915, 924 (7th Cir.) (citing Fed.R.Crim.P. 52(b) ), *cert. denied,* —— U.S. ——, 105 S.Ct. 440, 83 L.Ed.2d 366 (1984).

According to the decisions of this court, plain error is an error that resulted in "an actual miscarriage of justice, which implies the conviction of one who but for the error would have been acquitted." *United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). In addition, to enable a court to review for plain error, defendant's argument for reversal must be based on "newly-raised questions of law, untainted by factual ambiguity." *United States v. McCabe,* 720 F.2d 951, 955 (7th Cir.1983).

*United States v. Gironda,* 758 F.2d 1201, 1216 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 523, 88 L.Ed.2d 456 (1986).

The admission of the evidence in question does not constitute plain error. First, Brantley testified on direct examination that he had a feeling, but no actual knowledge, that Mosley owned the company from which AYC rented its premises. Transcript at 360. This opened the door to the Government's cross-examination on the extent of Brantley's knowledge regarding Mosley's interest in AYC's landlord. *See* Fed. R. Evid. 611(b); *United States v. Taylor,* 728 F.2d 864, 874 (7th Cir.1984). Second, even if the leasing evidence had been excluded, an acquittal would not necessarily have resulted. The jury properly had before it evidence regarding payments from National Furniture to Damon, Inc. and Brantley's knowledge of National Furniture's creation and operation. Further, the jury also considered evidence that Brantley had responsibility for signing checks to National Furniture. The existence of this evidence persuades this Court that no error resulting in a miscarriage of justice has occurred.

Brantley properly preserved the remaining evidentiary issues for review by timely objections. We turn to those issues.

■ During direct examination, Brantley testified extensively regarding Damon, Inc. portraying it as a legitimate, independent and functioning entity. Transcript at 362–75. The district judge, out of the presence of the jury, ruled that the Government could cross-examine Brantley about money received by Damon, Inc. directly from AYC. In support of her ruling, the district judge stated:

He [Brantley], through his testimony, is trying to convey to the jury that Damon was a legitimately run consulting firm, and that he obtained this money from Mr. Mosley in connection with that other business, that other operation, and that it was separately, independently run, and the government is entitled to contradict that.

*Id.* at 411.

During cross-examination of Brantley, the Government challenged his characterization of Damon, Inc. The Government showed that National Furniture and AYC constituted Damon, Inc.'s major clients, that Damon, Inc. reported approximately $67,000 in gross income for 1977 and 1978, that approximately $20,000 of Damon, Inc.'s 1977–1978 gross income came from National Furniture and approximately $33,000 came directly from AYC, that Brantley waited eleven months before informing AYC that it was making payments to Damon, Inc., that Brantley presented Damon, Inc. to the AYC Board of Directors as a corporation about to be founded, and that Damon, Inc. only filed tax returns for 1977 and 1978.

Having reviewed the transcript, we find that the Government's questions fell within the scope of Brantley's direct examination. This circuit has held on numerous occasions that when a party questions a witness on a subject, even though that subject may not be strictly relevant to the case, the party cannot complain on appeal if the opposing party subsequently introduces evidence on the same subject.... We have held that when a party elicits testimony as to only part of a transaction during cross-examination, the

opposing party is permitted to elicit testimony as to the whole transaction on redirect examination in order to advise the jury fully of all the facts surrounding the case.... We have reasoned that a party cannot be permitted on the one hand to introduce evidence that appears favorable to his argument and then complain, after the circumstances are fully developed, because the evidence becomes detrimental to his cause.

*United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir.1985) (citations omitted).

During cross-examination, the Government questioned Brantley about two checks totaling $15,000 issued to and endorsed by, Brantley drawn on AYC's account, and about an airline ticket which Brantley charged to an AYC credit card, all after AYC had lost its funding. Brantley contends that this evidence was inadmissible under Rule 404(b), Federal Rules of Evidence, because it was evidence of other crimes and prior bad acts.

■ When a defendant is charged with a crime and specific intent is an essential element of that crime, the Government may introduce evidence of prior or subsequent acts to establish the element of intent. The Government may introduce these acts even if the defendant has not placed his intent into question. *United States v. Liefer*, 778 F.2d 1236, 1242–43 (7th Cir.1985). An indictment charging the interstate transportation of fraudulently taken checks has two essential elements: "(1) interstate transportation of a stolen, converted, or fraudulently taken check of at least $5,000 value (2) with fraudulent intent." *United States v. Freeman*, 619 F.2d 1112, 1118 (5th Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981); *see* 18 U.S.C. § 2314. Count two of the instant indictment charges such a crime. Because fraudulent intent is an essential element of the charged crime, we need only consider whether the district court properly admitted the evidence of Brantley's subsequent misconduct under Rules 404(b) and 403.

■ In analyzing the admission of subsequent acts, this Court uses a four-part test:

[a]dmission of evidence of prior or subsequent acts will be approved if (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue (*i.e.* such that 'the consequential fact may be inferred from the proffered evidence,' 2 J. Weinstein & M. Berger, Weinstein's Evidence § 404[8] at 404–49 (1982)), (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*Liefer*, 778 F.2d at 1242 (quoting *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984)) (citations omitted).

■ We have already determined that "the evidence [was] directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged." This Court also finds that Brantley's receipt of $15,000 under his own signature from AYC and his use of AYC's credit card after AYC had lost its funding and without the approval of AYC's Board of Directors, was similar to the fraud charged in the indictment. These acts also occurred "close enough in time" because they were within three months of the time period covered by the indictment.

■ The contested evidence shows that Brantley signed two AYC checks to himself totaling $15,000 and used AYC's credit card without the approval of AYC's Board of Directors, after the Board had discontinued its meetings and after AYC had lost its funding. These acts do not reflect purely innocent activity. They clearly and convincingly show an intent to defraud.

■ Finally, "with respect to Fed.R. Evid. 403, '[t]he trial judge's assessment of relative probative value and unfair prejudice is generally accorded great deference because of [her] firsthand exposure to the

evidence and [her] familiarity with the course of the trial proceedings.'" *Liefer*, 778 F.2d at 1244 (quoting *Levy*, 741 F.2d at 924) (citations omitted). Because the evidence was probative of Brantley's intent to defraud, the trial court did not abuse her discretion in admitting it.[3]

### IV. *Whether the Government improperly referred to "other acts" evidence during closing argument?*

 In its closing argument, the Government referred to the property lease between AYC and MCM, to the consulting agreement between AYC and Damon, Inc., and to Brantley's receipt of checks and his use of the AYC credit card after AYC had lost its funding. The Government summed up all the evidence by stating, "[w]hat you have described here really is the looting of a not-for-profit corporation by the man who ran it, Robert Brantley, and his friend, Bill Mosley." Transcript at 577. During rebuttal, the Government, referring to all the evidence, stated, "[f]rom the start they agreed to rip off AYC any way they could." *Id.* at 607.

In closing argument, the prosecutor may make any comments supported by the evidence or in reply to any argument raised by his opponent.... Moreover, the closing argument must be viewed as a whole to determine whether any improper statements were unfairly prejudicial.... In order to constitute reversible error, these statements must be calculated to unfairly prejudice the defendant or suffice to alter the outcome of the trial.

*United States v. Brack*, 747 F.2d at 1152 (citations omitted); *see also United States v. Doyle*, 771 F.2d 250, 258 (7th Cir.1985).

In the instant case, the contested statements accurately described the essence of Brantley's action. The prosecutor may " 'speak fully although harshly upon the

action and conduct of the accused, if the evidence supports his comments....'" *United States v. Hattaway*, 740 F.2d 1419, 1426 (7th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 599, 83 L.Ed.2d 708 (1985). Further, the closing argument as a whole did not inflame the jury, and the district court properly instructed the jury on the elements of the crime charged. Finally, the jury had substantial evidence upon which to base its verdict. Therefore, these statements did not constitute reversible error.

### *Conclusion*

This Court AFFIRMS Brantley's conviction.

---

3. The Government originally argued that this evidence was admissible to impugn Brantley's credibility. The district court thought that the evidence was relevant for a variety of reasons, Transcript at 387 (Apr. 26, 1984), but never articulated them. Because we find that the evidence was properly admitted, any improper classification at the time of admission did not prejudice Brantley's case. *United States v. Blewitt*, 538 F.2d 1099, 1101 n. 2 (5th Cir.), *cert. denied*, 429 U.S. 1026, 97 S.Ct. 650, 50 L.Ed.2d 629 (1976).